**Vernon CROWDER; Stephanie Good,
Plaintiffs–Appellants,**

**v.**

**Yukio KITAGAWA, Chairman, Board of
Agriculture, State of Hawaii; Calvin
Lum, et al., Defendants–Appellees.**

No. 94–15403.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1995.

Decided April 30, 1996.

Michael A. Lilly, Honolulu, Hawaii, for plaintiffs-appellants.

Heidi M. Rian and Sonia Faust, Deputy Attorneys General, Honolulu, Hawaii, for defendants-appellees.

Burton J. Rubin, Alexandria, Virginia, for amicus curiae American Society of Travel Agents, Inc.

Jessica Dunsay Silver and Rebecca K. Troth, United States Department of Justice, Washington, DC, for amicus curiae United States of America.

Before: HUG, Jr., Chief Judge, THOMPSON and O'SCANNLAIN, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

The plaintiffs are a class of visually-impaired persons who use guide dogs. They seek exemption from Hawaii's imposition of a 120-day quarantine on carnivorous animals entering the state. They contend Hawaii's quarantine, designed to prevent the importation of rabies, violates the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., and their constitutional rights of travel, equal protection and substantive due process. The district court rejected all these claims and entered summary judgment in favor of Hawaii. The class plaintiffs appeal.

We have jurisdiction under 28 U.S.C. § 1291. We hold that without reasonable modifications to its quarantine requirement for the benefit of visually-impaired individuals who rely on guide dogs Hawaii's quarantine requirement effectively prevents such persons from enjoying the benefits of state services and activities in violation of the ADA. We conclude there is a genuine dispute of a material fact as to whether the plaintiffs' proposed alternatives to Hawaii's quarantine for guide dogs are "reasonable modifications" under the terms of the ADA and implementing regulations. We reverse the district court's summary judgment in favor of Hawaii, and remand the case to the district court for further proceedings. We do not reach the plaintiffs' contentions that Hawaii's quarantine requirement violates their constitutional rights of travel, equal protection and substantive due process.

FACTS

Hawaii is one of the few places in the world which is completely free from rabies. To protect the state from the importation of the rabies disease, the Hawaii legislature enacted Hawaii Revised Statute § 142–2. This statute allows the Hawaii Department of Agriculture to make rules for the quarantine of animals upon their arrival in Hawaii.

Pursuant to section 142–2, the Hawaii Department of Agriculture established a 120–day quarantine in a quarantine station for

dogs, cats and other carnivorous animals entering Hawaii from the United States mainland or from any other country that is not considered rabies free. Haw.Admin.R. § 4–29–9(a).

Upon written request, a disabled person seeking to bring a guide dog into the state may stay free of charge for the 120–day quarantine period in one of two apartments and a cottage at the quarantine station. The station is located in Halawa Valley, a somewhat remote area approximately seven miles from central Honolulu.

After an initial 10–day observation period, a guide dog may train with its owner on the station grounds, Haw.Admin.R. § 4–29–15(b)(1)–(2), and may train off the station grounds for up to four hours a day, three days a week, if accompanied by a department inspector. Haw.Admin.R. § 4–29–15–(b)(3). During the time a guide dog is outside the quarantine station, however, it may have no contact with other animals or humans. Haw.Admin.R. § 4–29–15(b)(5). After the 120–day quarantine period, if the guide dog is found not to have rabies, the dog is released to its owner.

The quarantine applies to visually-impaired users of guide dogs without regard to place of residence. A visually-impaired Hawaii resident who travels to the mainland United States on business or pleasure will have his guide dog quarantined for 120 days upon his return. Similarly, a visually-impaired resident of California, or any other place in the world which is not rabies free, who travels to Hawaii for business or pleasure will have his guide dog quarantined.

Vernon Crowder, a resident of California, and Stephanie Good, a resident of Hawaii, are visually-impaired users of guide dogs. They filed suit in March 1993 against the State of Hawaii and various governmental officials (collectively, Hawaii), and were certified as class representatives (collectively, the plaintiffs) by the district court in January 1994.

The evidence produced in support of the parties' motions for summary judgment established that the state's quarantine requirement denies visually-impaired persons the ability to make meaningful use of services the state provides. The plaintiffs rely upon their guide dogs to assist them in negotiating public streets and using transportation systems. Without their dogs to guide them, the plaintiffs are severely restricted in their ability to use state services. The quarantine also renders guide dogs susceptible to irretrievable loss of their training.

The parties agree that the quarantine does not guarantee that rabies will not be imported into Hawaii by quarantined animals. The rabies disease can have an incubation period longer than 120 days. No case of rabies has ever been intercepted by the quarantine, and to the knowledge of the parties, no guide dog has ever been diagnosed with rabies.

In support of their contention that Hawaii's quarantine requirement can be reasonably modified for the benefit of visually-impaired users of guide dogs, the plaintiffs contended that more effective alternative means were available to prevent the importation of rabies by guide dogs. Such alternatives include a vaccine-based system by which "dead" vaccines can be administered to the animals by veterinarians, who can then certify the vaccinations by fitting the animals with identifying microchips. The animals can be tested before admission into Hawaii by use of rabies virus antibody titers to ensure against the disease.

In response to the plaintiffs' evidence of what they contended were effective alternatives to the quarantine requirement, Hawaii produced evidence that its state legislature had recently undertaken a review of the quarantine program. In this review, the legislature had conducted hearings and had considered alternatives such as those proposed by the plaintiffs. The effectiveness of both the state's quarantine requirement and the vaccine-based alternatives were vigorously debated by veterinarians, scientists and academicians during these hearings. In the face of conflicting scientific and medical opinions, the legislature did not enact any changes to the quarantine or the modifications already in place for the visually-impaired.

In granting summary judgment for Hawaii, the district court held that the plaintiffs were not "qualified individual[s] with a dis-

ability" under the ADA, 42 U.S.C. § 12132, because they were not being excluded from the receipt of state services, programs or activities by reason of their disability. All public services, programs, and activities were open to them, as well as to all other residents of and visitors to Hawaii. The district court also held that even if the plaintiffs did fall within the definition of "qualified individuals" under the ADA, the relevant federal regulations require only that "reasonable modifications" be made to avoid discrimination, and the quarantine already had modifications in place for the benefit of the visually-impaired. The district court granted summary judgment in favor of Hawaii, and this appeal followed.

## DISCUSSION

The ADA was enacted by Congress in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices...." 42 U.S.C. § 12101(a)(5).

The plaintiffs allege Hawaii's quarantine system violates section 12132 of the ADA, which provides that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Section 12131(2) defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies or practices, removal of architectural barriers, or the provision of auxiliary aides and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

The linchpin of the district court's summary judgment on the ADA claim, and the state's argument, is that "[t]he quarantine requirement is a public health measure, and not a 'service' or benefit furnished by the state to eligible participants." *Crowder v. Kitagawa*, 842 F.Supp. 1257, 1267 (D.Hawai'i 1994). Because, according to the district court, the quarantine requirement is not a service or benefit provided by the state, the quarantine does not deny the plaintiffs any benefits, and as a result they have no claim under the ADA.

The flaw in this analysis is the assumption that no violation of the ADA occurs unless a service or benefit of the state is provided in a manner that discriminates against disabled individuals. This simply is not so.

Section 12132 of the ADA precludes (1) exclusion from/denial of benefits of public services, as well as (2) discrimination by a public entity. Due to the insertion of "or" between exclusion from/denial of benefits on the one hand and discrimination by a public entity on the other, we conclude Congress intended to prohibit two different phenomena. Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability.

In section 12101(a)(5), Congress declared its intent to address "outright intentional exclusion" as well as "the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices." It is thus clear that Congress intended the ADA to cover at least some so-called disparate impact cases of discrimination, for the barriers to full participation listed above are almost all facially neutral but may work to effectuate discrimination against disabled persons.

Few would argue that architectural barriers to disabled persons such as stairs, or communication barriers such as the preference for the spoken word, are intentionally discriminatory. Yet, stairs can deny the wheelchair-bound access to services provided on the second floor of a government building;

and communicating only by the spoken word can deny deaf persons the ability to find out that it is the second floor where they must go to obtain the services they seek.

These and other types of barriers to participation by the disabled in public life do not provide any benefits themselves. Neither stairs nor the spoken word is a "service[ ], program[ ], or activit[y]" of a public entity, yet each can effectively deny disabled persons the benefits of state services, programs or activities.

A further indication of Congress' intent to cover both intentional discrimination and discrimination as a result of facially neutral laws is the explicit mandate in the ADA that federal regulations adopted to enforce the statute be consistent with the Rehabilitation Act, 29 U.S.C. § 794, an earlier congressional effort to combat discrimination against disabled persons by public entities receiving federal financial assistance. Section 12133 of the ADA provides that "[t]he remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights" applicable to section 12132 discrimination claims. 42 U.S.C. § 12133. *See also Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n. 3 (9th Cir.1995) ("The legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA.").

The Supreme Court interpreted the Rehabilitation Act in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). In *Choate*, the Court concluded that Congress intended to protect disabled persons from discrimination arising out of both discriminatory animus and "thoughtlessness," "indifference," or "benign neglect."

*Id.* at 295, 105 S.Ct. at 717. The Court held, however, that judicial review over each and every instance of disparate impact discrimination would be overly burdensome. Rather than attempt to classify a type of discrimination as either "deliberate" or "disparate impact," the Court determined it more useful to assess whether disabled persons were denied "meaningful access" to state-provided services. *Id.* at 302, 105 S.Ct. at 720–21; *see also Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir.), *cert. denied by Pennsylvania Secretary of Public Welfare v. Idell S.*, —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995) ("Congress could not have intended to limit the [ADA's] protections and prohibitions to circumstances involving deliberate discrimination.... Rather, the ADA attempts to eliminate the effects of ... benign neglect, apathy, and indifference.") (internal quotations omitted).

Although Hawaii's quarantine requirement applies equally to all persons entering the state with a dog, its enforcement burdens visually-impaired persons in a manner different and greater than it burdens others. Because of the unique dependence upon guide dogs among many of the visually-impaired, Hawaii's quarantine effectively denies these persons—the plaintiffs in this case—meaningful access to state services, programs, and activities while such services, programs, and activities remain open and easily accessible by others. The quarantine, therefore, discriminates against the plaintiffs by reason of their disability.[1]

During the four days of each week of the quarantine period when guide dogs must remain in the quarantine station this denial is especially acute. On the other three days when the dogs are allowed out of the quaran-

---

1. In his dissent, Judge O'Scannlain argues that if the quarantine discriminates or denies state services "by reason of blindness, then all people who are blind could" assert this ADA claim. Dissent at 1492 (emphasis omitted). Judge O'Scannlain explains that "the quarantine does nothing by reason of blindness; it affects the plaintiffs only because of their use of guide dogs." *Id.* (emphasis omitted). We respectfully disagree.

Many barriers to full participation of the disabled work their discriminatory effects due to the auxiliary aids upon which the disabled rely, and not due solely to the disabling impairment. For example, stairs do not affect victims of multiple sclerosis solely by reason of their disease; some victims of multiple sclerosis, particularly in its early stages, may still be able to walk. The architectural barrier of stairs works its discriminatory effect because other victims of the disease rely on wheelchairs to move around. In this instance, it is not the disease which renders the disabled incapable of accessing services, it is the reliance on a particular type of auxiliary aid which does so.

tine station grounds, the negative impact of the regulation is only slightly alleviated, because during these days the regulations require that the guide dogs avoid all physical contact with other humans or animals. Haw.Admin.R. § 4–29–15(b)(5). This effectively precludes visually-impaired persons from using a variety of public services, such as public transportation, public parks, government buildings and facilities, and tourist attractions, where humans or animals are inevitably present.

It is no response to assert that the visually-impaired, like anyone else, can leave their dogs in quarantine and enjoy the public services they desire. As the Department of Justice has noted in related regulations, "the general intent of Congress" was "to ensure that individuals with disabilities are not separated from their service animals," such as guide dogs. See 28 C.F.R. § 36, Appendix B, at 616 (service animals in public accommodations); 135 Cong.Rec. D956 (Statement of Sen. Simon) ("As an auxiliary aid, the use of assistive animals is protected by the Americans With Disabilities Act, in public accommodations as well as public services (including schools).").

■ We conclude that Hawaii's quarantine requirement is a policy, practice or procedure which discriminates against visually-impaired individuals by denying them meaningful access to state services, programs and activities by reason of their disability in violation of the ADA.

■ When a state's policies, practices or procedures discriminate against the disabled in violation of the ADA, Department of Justice regulations require reasonable modifications in such policies, practices or procedures "when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

■ There is a genuine dispute of material fact as to whether the plaintiffs' proposed modifications to Hawaii's quarantine amount to "reasonable modifications" which should be implemented, or "fundamental[ ] alter[ations]," which the state may reject. The district court refused to consider this question because

> [t]he legislature has already thoroughly considered [the plaintiffs'] proposed alternatives and has rejected them. As noted earlier, it is the province of the legislature, and not this court, to assess the efficacy of public health measures against the risks they are designed to reduce, particularly when the questions are debatable and experts disagree as to the best solution to the problem.

*Crowder,* 842 F.Supp. at 1267.

The district court concluded it could not assess the reasonableness of the plaintiffs' proposed modifications in light of the legislature's own consideration of the issue. Yet in virtually all controversies involving the ADA and state policies that discriminate against disabled persons, courts will be faced with legislative (or executive agency) deliberation over relevant statutes, rules and regulations.

The court's obligation under the ADA and accompanying regulations is to ensure that the decision reached by the state authority is appropriate under the law and in light of proposed alternatives. Otherwise, any state could adopt requirements imposing unreasonable obstacles to the disabled, and when haled into court could evade the antidiscrimination mandate of the ADA merely by explaining that the state authority considered possible modifications and rejected them.

We are mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures acting within their traditional police powers. *See Queenside Hills Realty Co. v. Saxl,* 328 U.S. 80, 82–83, 66 S.Ct. 850, 851–52, 90 L.Ed. 1096 (1946). However, when Congress has passed antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved.

Whether the plaintiffs' proposed alternatives to Hawaii's quarantine for guide dogs constitute reasonable modifications or fundamental alterations cannot be determined as a matter of law on the record before us. Once

again turning to the Rehabilitation Act, we have held that the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry. *Chalk v. United States District Court,* 840 F.2d 701, 705 (9th Cir.1988). Moreover, inquiry into reasonable modification would necessitate findings of fact regarding the nature of the rabies disease, the extent of the risk posed by the disease, and the probability that the infected animals would spread it.[2] *Cf. School Bd. of Nassau County v. Arline,* 480 U.S. 273, 288, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987) (such findings necessary in determining if tuberculosis-infected school teacher is "otherwise qualified" to teach under section 504 of the Rehabilitation Act).[3]

## CONCLUSION

We reverse the district court's grant of summary judgment in favor of Hawaii. We remand this case to the district court for determination of the factual dispute whether the plaintiffs' proposed modifications to Hawaii's quarantine are reasonable under the ADA.

We do not address the plaintiffs' constitutional claims because if the plaintiffs prevail on their ADA claim resolution of their constitutional claims will be unnecessary. It is "a fundamental rule of judicial restraint" that federal courts "ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985) (internal quotations omitted); *Hospital & Service Employees Union v. NLRB,* 743 F.2d 1417, 1427 (9th Cir.1984). In the event the plaintiffs do not prevail on their ADA claim, this panel of the court will then consider, upon request to do so, the district court's summary judgment on the plaintiffs' constitutional claims.

Any further appeals or requests for review in this case will be heard by the present panel.

REVERSED and REMANDED.

O'SCANNLAIN, Circuit Judge, dissenting:

I cannot agree that the State of Hawaii has violated its obligation to blind people under federal law. Because the plaintiffs have failed to offer any evidence to satisfy two of the three elements required to be proven by the plain language of the statute at issue in this case, I respectfully dissent.

I

To state a claim under section 202 of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, a plaintiff bears the burden of proving: (1) that he is a "qualified individual with a disability" as defined in section 12131(2); (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Tyler v. City of Manhattan,* 857 F.Supp. 800, 817 (D.Kan.1994) (citation omitted); *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 846 F.Supp. 986, 990 (S.D.Fla.1994).

As to the first requirement, the blind plaintiffs in this case are clearly disabled. However, it is not clear whether they meet the "qualified" prong because, as noted *infra,* they have failed to identify a specific program, activity, or benefit for which they are "qualified," i.e. for which they "meet[ ] the essential eligibility requirements." 42 U.S.C.

---

**2.** This analysis is particularly important when, as here, there is evidence that the risk of rabies being imported by guide dogs is low, vaccine-based alternatives may be equally or more effective in preventing the importation of rabies; and the quarantine has not once in over 75 years detected a single case of rabies among imported dogs.

**3.** Hawaii asks us to find the evidence submitted by the plaintiffs in support of their proposed

alternatives does not amount to reliable, relevant scientific evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir. 1995). We decline to do so. The district court did not address this issue of scientific reliability, and we will not consider it in this appeal. Hawaii may present its *Daubert* objection to the district court in the course of further proceedings following remand.

§ 12131(2). Unless the plaintiffs identify such a program, activity, or benefit, this court cannot even determine what the "essential eligibility requirements" are, much less whether the plaintiffs have met them.[1] I need not address this first requirement, however, because in my view the plaintiffs have clearly failed to raise an issue of material fact with regard to either of the last two elements. These two requirements will be discussed in turn.[2]

## II

### A

The record discloses that the plaintiffs have failed to offer any evidence whatsoever that Hawaii's quarantine has excluded them from participation in, or denied them the benefits of, any specific public entity's services, programs, or activities. As the district court noted, Hawaii's quarantine is a public health measure, and it does not provide any "benefits" to which the plaintiffs could be denied. In addition, to the extent that the quarantine is a "service, program or activity," it is clear that they have been allowed to "participate." The plaintiffs therefore must prove that they have been excluded from, or denied the benefits of, some particular state service, program or activity *other* than the quarantine.

In opposition to the defendants' summary judgment motion, the plaintiffs filed at least 15 declarations in the district court. One searches these declarations in vain for even a solitary reference to a specific program, activity, or service to which the plaintiffs have

been denied access or benefits. The plaintiffs have thus failed to meet their burden of proof. *See Lincoln Cercpac v. Health and Hosps. Corp.*, 920 F.Supp. 488, 498 (S.D.N.Y. Mar. 21, 1996) ("[P]laintiffs here have not defined a service available to the non-disabled that they are being denied by reason of their disability. Accordingly, we find plaintiffs have no substantial likelihood of success on their ADA claims."); *Casey v. Lewis*, 834 F.Supp. 1569, 1585 (D.Ariz.1993) (plaintiffs failed to establish Rehabilitation Act claim in part because they "did not identify particular programs from which any of the handicapped inmates were excluded because of their handicaps").

In spite of plaintiffs' failure of proof, the majority concludes that "[t]he evidence produced in support of the parties' motions for summary judgment established that the state's quarantine requirement denies visually-impaired persons the ability to make meaningful use of services the state provides." Op. at 1482. There are at least two immediate problems with this conclusion.

First, undoubtedly because the plaintiffs have failed to do so, the majority does not identify a particular state service, program, or activity to which the plaintiffs have been denied benefits or access. Instead, the opinion makes only a broad reference to "a variety of public services, such as public transportation, public parks, government buildings and facilities, and tourist attractions...." Op. at 1485. The court's conclusion that the blind have been denied access to such services is simply unsupported by the record.[3]

---

1. To the extent that the plaintiffs claim that they have been denied access to "public transportation" and "public parks," see *ante* at 1485, they, like the rest of the general public, clearly meet the "essential eligibility requirements" for receipt of such services.

2. Although the district court did not reach the third requirement, its judgment may be affirmed on any grounds supported by the record. *Herring v. FDIC*, 72 F.3d 762, 764 (9th Cir.1995).

3. The majority also improperly relies on regulations which are inapplicable to Title II claims. The majority states that:

> It is no response to assert that the visually-impaired, like anyone else, can leave their dogs in quarantine and enjoy the public ser-

vices they desire. As the Department of Justice has noted in related regulations, "the general intent of Congress" was "to ensure that individuals with disabilities are not separated from their service animals," such as guide dogs. *See* 28 C.F.R. § 36, Appendix B, at 616....

The provision relied on by the majority actually states that:

> [28 C.F.R. § 36.302(c)(1)] reflects the general intent of Congress that *public accommodations* take the necessary steps to accommodate service animals and to ensure that individuals with disabilities are not separated from their service animals.

(Emphasis added). As the district court correctly noted, this provision is simply inapplicable to public entities:

Second, the plaintiffs' claims are defeated by their own evidence. In the extremely limited section of their appellate brief addressing this issue, the plaintiffs list a broad range of public programs geared specifically to the blind. After listing these services, they offer only the following argument:

> Only blind users of guide dogs allowed to enter Hawaii can benefit from the foregoing. Those *unable to travel because of quarantine* are foreclosed from them. The blind in Hawaii cannot leave with their guide dogs, thereby *preventing* them from public services, programs and activities on the mainland U.S.

(Emphasis added.)

Plaintiffs' entire argument on appeal, therefore, boils down to the assertion that the quarantine, by depriving them of access to their guide dogs, deprives them of the ability to travel, and because they cannot travel they are excluded from virtually all public programs provided to the blind.[4] Even assuming that the plaintiffs may use such an argument to overcome their otherwise clear obligation to identify a *particular* program from which they have been excluded or denied benefits, it is entirely undermined by their admissions that they have traveled, albeit at times with difficulty, without guide dogs.[5] Accordingly, their only argument on this point, i.e. that the quarantine

*excludes* them from participation in or *denies* them the benefits of *all* state services, programs, or activities provided to the blind *because it makes them unable to travel*, simply fails.

I am not unmindful of the difficulties which the plaintiffs may encounter when traveling without their guide dogs. However, the plaintiffs have (1) failed to offer any evidence establishing that they have been denied the benefits of, or participation in, any particular state program, service, or activity, and (2) failed to offer evidence supporting their novel alternative argument that they have been excluded from all such programs because the quarantine prohibits them from traveling. As such, I have no choice but to conclude that they have failed to raise an issue of material fact regarding whether the quarantine violates Title II of the ADA.

**B**

Plaintiffs have also failed to offer evidence establishing that they have suffered "discrimination" within the meaning of the statute. The Hawaii quarantine is a facially-neutral public health measure of general applicability. Nothing in the legislation or regulations enacting the quarantine creates any classification whatsoever; there is thus no *facial* discrimination.

---

Title III and its regulations govern discrimination in public accommodations. Section 12181(7) of the ADA defines "public accommodations" to cover [certain] private entities.... The definition of "private entity" in 42 U.S.C. § 12181(6) specifically excludes any public entity such as the State of Hawaii. Accordingly, neither title III of the ADA nor its regulations concerning service animals apply to the Hawaii quarantine system.
*Crowder v. Kitagawa,* 842 F.Supp. 1257, 1267 (D.Haw.1994).

**4.** Significantly, plaintiffs do *not* allege that any particular state "public park," "government building," or "tourist attraction," *ante* at 1485, forbids them from using a guide dog once that dog successfully passes through quarantine.

**5.** See Declarations of Patricia Blum, ¶ 5 ("I travel to the mainland on business at least 4 times a year. I am put back on a cane and all the stress is back."); Charles Crawford, ¶ 6 ("On those few occasions where I have had to use a cane instead

of the dog, I have had to move much slower with almost full concentration on how I was getting to where I needed to be."); Vernon Crowder, ¶ 5 ("For pleasure, I have travelled to Western Europe, Mexico, Canada, and, on two occasions, Hawaii. *With the exception of the trips to Hawaii and two or three trips elsewhere,* I have always travelled with my guide dog.") (emphasis added); Stephanie Good, ¶ 4 ("I have travelled to the mainland of the United States and to Australia without a guide dog."); Stanley Greenberg, ¶ 3 ("For thirty years, I travelled with a cane and so am able to testify about the difference between travelling with a cane and with a guide dog."); Jeanne–Marie Moore, ¶ 3 ("Before I ever had a guide dog, I had travelled to Hawaii as a cane user."); and Judith Weymouth, ¶ 20 ("In April, 1991, I was required to fly to Washington, D.C., to represent the Aloha Council of the Blind. If I had a guide dog, a trip like this would have been a routine thing. Without a guide dog, there was nothing routine about it."), and ¶ 25 (describing a trip to Australia to pick up a guide dog that was apparently undertaken without a guide dog).

The majority, relying in large part on *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), states that "[i]t is . . . clear that Congress intended the ADA to cover at least some so-called *disparate impact* cases of discrimination. . . ." Op. at 1483. Applying disparate impact analysis, the majority concludes that "Hawaii's quarantine requirement is a policy, practice or procedure which discriminates against visually-impaired individuals by denying them meaningful access to state services, programs or activities in violation of the ADA." Op. at 1485.[6]

I respectfully disagree both with the majority's application of *Choate* and also with its finding of discrimination in this case. In *Choate*, the State of Tennessee proposed to cut back the number of annual inpatient hospital days that the state Medicaid program would pay on behalf of Medicaid recipients. Disabled recipients alleged that the proposal would have a disproportionate effect on the disabled, and that it therefore discriminated against them in violation of section 504 of the Rehabilitation Act. The Supreme Court stated that "[w]hile we reject the boundless notion that all disparate-impact showings constitute prima facie cases under section 504, we *assume without deciding* that section 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped." *Id.* at 299, 105 S.Ct. at 719 (emphasis added). Proceeding from that assumption, the Court then stated that "[t]o determine which disparate impacts § 504 might make actionable, the proper starting point is *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)." *Id.* at 299–300, 105 S.Ct. at 719–20. "The balance struck in *Davis* requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." *Id.* at 301, 105 S.Ct. at 720.

The Court then examined whether the proposed program would deny the disabled "meaningful access" to Medicaid services in Tennessee, and concluded that it would not:

The 14-day rule challenged in this case is neutral on its face, is not alleged to rest on a discriminatory motive, and does not deny the handicapped access to or exclude them from the particular package of Medicaid services Tennessee has chosen to provide. The State has made the same benefit–14 days of coverage-equally accessible to both handicapped and nonhandicapped persons, and the State is not required to assure the handicapped "adequate health care" by providing them with more coverage than the nonhandicapped.

*Id.* at 309, 105 S.Ct. at 724.

Rather than supporting the majority's position, the Court's analysis suggests that the ADA does not reach the claim asserted in this case. The quarantine is neutral on its face, and is not alleged to rest on a discriminatory motive. Moreover, as explained *infra*, the plaintiffs have failed to provide any evidence showing that the quarantine excludes the blind from any public benefit. I therefore disagree with the majority's conclusion that *Choate* supports the proposition that the ADA reaches the plaintiffs' claim.

It is worth noting that *Patton v. TIC United Corp.*, 77 F.3d 1235 (10th Cir.1996) also suggests that the ADA does not apply here. In *Patton*, the plaintiff claimed that a Kansas law placing a cap on punitive damage awards was void as superseded by section 202. Applying *Choate*, the Tenth Circuit concluded that the ADA did not apply to the claim:

Interpreting the Rehabilitation Act, the Supreme Court has held that a facially neutral governmental restriction *does not deny "meaningful access" to the disabled simply because disabled persons are more likely to be affected by it.* Even if the burden of the . . . . damage cap falls disproportionately on the disabled, [*Choate*] *requires only that Patton have the same access* to a jury determination of damages *as everyone else.* He did. Because the

---

6. As explained in Part III *supra*, the majority's reference to "visually-impaired individuals" is simply too broad; there is no allegation nor evidence that the quarantine affects the vast majority of blind people, i.e., those who do not use guide dogs. Furthermore, as also explained *supra*, the fact that the quarantine affects the plaintiffs because it limits their use of guide dogs does not discriminate against them "by reason of their disability."

damages limitation applies to all victorious plaintiffs, Patton was not denied access to a jury determination of damages by reason of disability.

*Id.* at 1245 (emphasis added) (citations omitted). This reasoning suggests that even if the burden of Hawaii's quarantine is found to fall disproportionately on the blind (a proposition which I discuss in Part III), the ADA is not violated so long as the blind have equal access to their animals as everyone else.[7] This condition is clearly met here. Accordingly, I am persuaded that the ADA does not reach the plaintiffs' discrimination claim.

### III

Even assuming that the plaintiffs have raised an issue of material fact regarding whether they were discriminated against, they have failed to offer evidence showing that any such discrimination occurred "by reason of their disability," the remaining hurdle to be overcome.

The ADA defines "disability" in relevant part as "a physical or mental impairment that substantially limits one or more of the major life activities of" an individual. 42 U.S.C. § 12102(2)(A). Properly characterized, therefore, the plaintiffs' disability is their blindness. In order to prevail under Title II, they must therefore show that the quarantine discriminates against them, or denies them access to state benefits, by reason of their blindness. This they have not done.

The primary flaw in the plaintiffs' argument is the erroneous, implicit assumption that dependence upon a guide dog constitutes a "disability" under Title II. For example, the plaintiff classes in this case were defined as follows:

The Plaintiff Vernon Crowder class shall be defined as non-residents of Hawaii who are blind *and who desire to freely travel* to Hawaii for business and/or pleasure *with their certified guide dogs* .... The Plaintiff Stephanie Good class shall be defined as residents of Hawaii who are blind *and who desire to freely travel* for business and/or pleasure from Hawaii to the mainland United States and/or foreign countries and return to Hawaii *with their certified guide dogs* ....

(Emphasis added). The members of the plaintiff classes thus have two distinguishing characteristics: (1) they are blind, and (2) they desire to travel with their guide dogs. Even assuming arguendo that the quarantine has a disparate impact on the plaintiffs, it does so only because of the latter characteristic.[8] However, in order to state a claim under Title II, the plaintiffs must show that the disparate impact occurred because of the former characteristic; only the former is a "disability" under Title II.

This conclusion is supported by *Flight v. Gloeckler*, 68 F.3d 61 (2d Cir.1995). The plaintiff in *Flight*, who suffered from multiple sclerosis and was restricted to a wheelchair, was a client of the New York State Office of Vocational and Educational Services for Individuals with Disabilities ("VESID"). The plaintiff decided to purchase a van, and he petitioned VESID for financial assistance to make necessary modifications to the van. VESID's policies allowed it to spend $10,500 to modify a van for a client who was to able to drive, but only $4,000 if the client planned to be a passenger. VESID found that the plaintiff was too severely disabled to drive, and thus authorized allocation of only $4,000. The plaintiff sued, alleging a violation of both section 504 of the Rehabilitation Act and section 202 of the ADA.

The Second Circuit rejected the plaintiff's claim. After noting that the Rehabilitation Act "does not require all handicapped per-

---

7. *Cf. Lincoln Cercpac v. Health and Hosps. Corp.*, 920 F.Supp. 488, 498 (S.D.N.Y.1996) ("the disabled are not entitled to more public services than the abled receive, even if the disabled need them") (citing *Choate*).

8. This fact is implicitly acknowledged by the plaintiffs and their supporting amici. For example, the United States argues that "[t]he [district]

court also claimed, ignoring the record, that plaintiffs failed to show that they had been denied state services as a result of the quarantine. Plaintiffs, however, submitted affidavits that *because the quarantine deprives them of their guide dogs,* they are denied meaningful access to almost all state services—services for which they are clearly eligible." Brief of United States as amicus curiae, at 11 (emphasis added).

sons to be provided with identical benefits" but "mandates only that services provided nonhandicapped individuals not be denied [to a disabled person] *because he is handicapped,*" *id.* at 63–64 (quoting *P.C. v. McLaughlin,* 913 F.2d 1033, 1041 (2d Cir. 1990)) (emphasis added), the court stated that "Flight was not denied the additional subsidy 'solely by reason of . . . his disability' within the meaning of § 504." *Id.* at 64. The court noted that "[t]he denial of the increased allowance was not based upon Flight's classification as a victim of multiple sclerosis, but rather upon the type of modification that he requested." *Id.*

In reaching this conclusion, the court rejected a claim similar to the claim implicitly made by the plaintiffs here:

> Flight contends that his disability is not multiple sclerosis, but rather an inability to drive, but this argument is unpersuasive. A disability is a "physical or mental impairment," . . . i.e., "any *physiological* disorder or condition . . . affecting" the neurological system. Clearly, an inability to drive is not a physiological condition, but rather a *result* of a physiological condition, viz., Flight's neurological disorder.

*Id.* (emphasis in original) (citations omitted). The court thus rejected the plaintiff's Rehabilitation Act claim. Importantly, the court rejected his ADA claim on similar grounds:

> [The ADA] is inapplicable because the distinction in the present case is not based upon Flight's disability, multiple sclerosis, but rather upon his inability to drive. Thus, VESID does not provide varying services or benefits "on the basis of disability" within the meaning of § 35.130(b)(1). . . .

*Id.*

This reasoning is equally applicable here. The plaintiffs' dependence on their guide dogs is, properly considered, a result of their physical impairment, rather than a physical impairment in its own right. Accordingly, even if the quarantine is found to have a disparate impact on the plaintiffs, it does not do so by reason of their disability.

The fact that the quarantine does not discriminate on the basis of blindness is also borne out by the fact that the record is devoid of any allegation or evidence that the quarantine discriminates against blind people generally.[9] Indeed, the plaintiff class members represent only a tiny portion of the blind; reports in various newspapers [10] indicate that only somewhere between 1–5% of the blind use guide dogs.[11] If the quarantine does, as the plaintiffs allege, discriminate or deny state services by reason of *blindness,* then *all* people who are blind could constitute members of the plaintiff class and could assert ADA claims. The fact that the plaintiffs

---

9. Indeed, Hawaii seems to have made a concerted effort to ensure that state services are available to the blind. See H.R.S. § 347–20, stating that "it is the policy of this State to encourage and enable the blind . . . to participate fully in the social and economic life of the State and to engage in remunerative employment. . . . [T]he blind . . . have the same right as the able-bodied to the full and free use of the streets, highways, sidewalks, walkways, public buildings, public facilities, and other public places."

10. This court may take judicial notice of adjudicative facts appearing in newspapers. See Fed. R.Evid. 201; *Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 458 (9th Cir.1995); *Peters v. Delaware River Port Authority of Pennsylvania and New Jersey,* 16 F.3d 1346, 1356 n. 12 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 62, 130 L.Ed.2d 20 (1994).

11. *See, e.g.,* U.S. News & World Report, March 11, 1996 (Vol. 120, No. 10), at 14 (reporting, on the basis of data provided by the American Foun-

dation for the Blind, that 1 percent of blind people use guide dogs); Cathryn Creno, "Experts Hope to Make More Canine Help Available," The Arizona Republic, July 17, 1994, at F1 (reporting that "[o]nly 3 to 5 percent of blind Americans use guide dogs," and quoting Jim LaMay, executive director of the Arizona Center for the Blind and Visually–Impaired, as stating that "[i]t's definitely only a small percentage of the blind that use seeing-eye dogs."); Laura Randall, "Guide Dogs, a Rare Breed Among Blind," Chicago Tribune, June 1, 1993, at 8 (reporting that Ed Eames, author of a book about guide dog schools and a column in Dog World magazine, "estimates that only about 1.5 percent of [blind Americans] rely on dogs"); Martha Sherrill, "It's a Guide Dog's Life," The Washington Post Magazine, January 13, 1991, at W17 ("There are an estimated 10,-000 guide dogs working in this country used by 5 percent of the blind."); and Judy Siegel–Itzkovich, "Guide Dogs, a Blue and White Kind," The Jerusalem Post, January 5, 1990, at 7 ("In most developed countries, two to three percent of the blind have guide dogs. . . .").

have chosen to file suit while other blind individuals have not simply points out that the quarantine does nothing by reason of *blindness;* it affects the plaintiffs only because of their use of guide dogs.

Because the plaintiffs are unable to show that the quarantine discriminates against them by reason of their blindness, they have failed to establish an issue of material fact on an essential element of their claim.

### IV

For the foregoing reasons, I would affirm the district court's grant of summary judgment to the defendants on the plaintiffs' ADA claim.[12]

---

12. In light of the majority's decision to remand the case for further findings on the issue of "reasonable modifications," I need not address the plaintiffs' constitutional claims here.