Valjeanne CURRIE, et al., Plaintiffs

v.

GROUP INSURANCE COMMISSION,
et al., Defendants.

No. CIV A 00–10142–EFH.

United States District Court,
D. Massachusetts.

June 14, 2001.

S. Stephen Rosenfeld, Suzanne L. Schwartz, Rosenfeld & Associates, Boston, MA, Richard Ames, Brookline, MA, for Valjeanne Currie, Mary Johnston, Plaintiffs.

Pierce O. Cray, Sinkel, Attorney General's Office, Boston, MA, Ginny Sinkel, Office of the Attorney General, Boston, MA, for Group Insurance Commission, defendant.

Pierce O. Cray, Sinkel, Attorney General's Office, Boston, MA, for Dolores L. Mitchell, Deborah W. Heslop, Robert W. Hungate, Andrew S. Natsios, Charles D. Baker, Sr., Alfred A. Fondacaro, Mark P. Mulcahy, Linda Ruthardt, Christine M. Truax, John P. Walsh, Janice B. Wyatt, Richard J. Zeckhauser, Defendants.

## MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

Plaintiff Valjeanne Currie has brought this suit as a class action against the Group Insurance Commission ("GIC") alleging that the GIC's Long Term Disability ("LTD") policy violates her constitutional and statutory rights.[1] At issue in this matter is whether conditioning the receipt of LTD benefits beyond one year only to those mentally disabled individuals confined to an institution violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as well as the Americans with Disabilities Act ("ADA"). Specifically, plaintiff claims that, in addition to the interference with her constitutional rights, Title II of the ADA is violated by a condition of this nature. Defendants dispute such constitutional violations and allege that a claim in the form of employment discrimination is the exclusive province of Title I of the ADA.

To this end, the parties have filed cross-motions for summary judgment. After reviewing the record and hearing oral argu-

---

1. Plaintiff Valjeanne Currie has not yet moved for certification of the class.

ment, this Court makes the following factual findings and conclusions of law.

## I. Factual Findings

The material facts of this matter are largely undisputed by the parties. Beginning in 1985, Plaintiff Valjeanne Currie, a Massachusetts resident, worked for the Commonwealth of Massachusetts at the Massachusetts Mental Health Center ("Mass Mental"). Between the years 1994 and 1999, she continued her work in the Medical Records Program of Mass Mental.

Plaintiff suffers from schizophrenia, a long-term mental disability.[2] In June of 1999, this mental illness caused plaintiff to become totally disabled. As a result, she was forced to leave her work at Mass Mental on a long-term basis. The manifestation of her illness in June, 1999 caused plaintiff to be hospitalized for several days and thereafter referred to Faulkner Hospital's intensive psychiatric day treatment program. Plaintiff was again hospitalized as a result of her illness from December 31, 1999 to January 4, 2000. Since that time, plaintiff has received intensive psychiatric care on an out-patient basis. This treatment is oriented toward helping plaintiff participate as an active member of society and to return to work one day.

Throughout her fourteen years of employment with the Commonwealth of Massachusetts, plaintiff participated in the GIC LTD plan.[3] This participation came in the form of paying monthly premiums to participate in the plan. The GIC was established pursuant to Massachusetts General Laws ch. 32A, § 3, as a state agency within the Commonwealth's Executive Office of Administration and Finance. Massachusetts General Laws ch. 32A, § 10D requires the GIC to establish an LTD plan for state employees. Currently, LTD benefits are offered to employees of the Commonwealth under a four-year contract of insurance between the GIC and the Hartford effective July 1, 1998.[4] The GIC selects the scope and coverage of the program, while the Hartford, as plan administrator, determines an individual employee's eligibility for disability benefits.

During the 1997 procurement process for the 1998 LTD contract, consultants from the employee benefits consulting firm of O'Neill, Finnegan & Jordan ("OFJ") recommended that the GIC provide only one year of outpatient benefits for individuals disabled due to mental illness, as opposed to an unlimited mental health benefit. This conclusion was reached because, in the consultant's opinion, only employer-paid plans, which by their nature have one-hundred percent participation rates, can afford such an inclusive benefit. The legislature of the Commonwealth, pursuant to Mass.Gen.L. ch. 32A, § 10D, has stated that the Commonwealth shall not make any contributions to the premiums of the disability plan.

The current LTD plan, a product of this round of consultations and made effective July 1, 1998, provides benefits for one year to individuals disabled due to mental illness.[5] After one year has expired, bene-

---

2. As indicated by the record, the parties are not in dispute over the nature or severity of plaintiff's mental disability.

3. As a state employee, plaintiff is ineligible for disability income under the federal Social Security Disability Insurance ("SSDI") program.

4. The Hartford was chosen by a bidding process among private LTD insurers that took place in 1998.

5. The GIC's program that had been in effect from July 1, 1993 until June 30, 1998 required mentally disabled employees to be hospitalized in order to receive any LTD benefits at all. The consulting firm of OFJ also pro-

fits cease, unless the individual is confined to a hospital or institution. In such a case, the benefits continue for the duration of the institutionalization. Under the plan, employees disabled for reasons other than mental disability are granted benefits until they are able to return to work or reach the age of 65. This is done irrespective of whether they are hospitalized.

In October, 1999, plaintiff received a letter dated October 21, 1999 from the Hartford informing her that her LTD claim was approved. This letter also informed her that unless she was hospitalized by June 6, 2000 (one year after the commencement of her benefits), her LTD benefits would cease. Plaintiff received benefits for one year under the GIC LTD plan. Two days before the benefits were scheduled to end, the state Superior Court ordered that they be continued. A preliminary injunction was entered for six months, and subsequently renewed in December, 2000. The preliminary injunction remains in force pending resolution of the matter before this Court.

## II. Summary Judgment Standard

In this matter, the parties have cross-moved for summary judgment. A motion for summary judgment shall be granted only upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 140 (1st Cir. 1998) (quoting Fed.R.Civ.P. 56(c)). In deciding a motion for summary judgment, the facts must be viewed "in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Borschow Hospital & Medical Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10, 14 (1st Cir.1996). Accordingly, in reviewing plaintiffs' motion, the facts are read in the light most favorable to defendants. Conversely, when analyzing defendants' motion the facts are evaluated in the light most favorable to plaintiffs.

## III. Plaintiffs' ADA Claim

### A. The Language and Structure of the ADA

■ Plaintiffs claim that the GIC's management of LTD benefits for non-institutionalized mentally disabled patients creates a cognizable claim under Title II of the Americans with Disabilities Act.[6] *See generally* 42 U.S.C. §§ 12131—12134. This alleged violation is said to originate from the fact that the LTD plan's limitation on benefits provided to a certain category of mentally disabled patients, namely outpatients, necessarily increases the isolation and segregation of the mentally disabled population. *See Olmstead v. L.C.*, 527 U.S. 581, 597, 601–02, 119 S.Ct. 2176, 2185, 144 L.Ed.2d 540 (1999). It is argued that by creating such a classification without any rational foundation, the mandate of the ADA, that public services are to be delivered to the community in a manner that promotes integration, is violated. *See* S.Rep. No. 116, 101st Cong., 1st Sess. 20 (1989); H.R.Rep. No. 485(II), 101st Cong.2d Sess. At 50 (1990), *reprinted in*

---

vided technical and actuarial support for the 1993–1998 contract. During this round of consultations, the underwriting principle of "adverse selection" became a major focal point in the establishment of LTD disability benefits. The ultimate conclusion of the adverse selection theory is that employees in a plan such as the one established by the GIC will always make the right economic choice for themselves. Providers therefore will have to tailor the amount of benefits they provide and the premiums they charge in accordance with this reality.

**6.** As plaintiffs pointed out at oral argument, certain procedural requirements associated with Title I have caused them to prefer to pursue a claim under Title II.

1990 U.S.C.C.A.N. at 332. This Court rules that such a claim is not cognizable under Title II of the ADA.

There exists a great divergence of opinion amongst the various appellate courts as to whether claims, such as the one brought by plaintiffs, are within the ambit of Title II of the ADA. *Compare Zimmerman v. Oregon Department of Justice,* 170 F.3d 1169, 1173–74 (9th Cir.1999) (Title II of the ADA does not incorporate the Rehabilitation Act's prohibition on employment discrimination); *Bledsoe v. Palm Beach County Soil and Water District,* 133 F.3d 816, 820–22 (11th Cir.1998) (Title II encompasses public employment discrimination). The Court of Appeals for the First Circuit has not yet had an occasion to rule on the issue. Indeed, sessions of the United States District Court for the District of Massachusetts have come to somewhat divergent conclusions on the subject. *Compare Downs v. Massachusetts Bay Transportation Authority,* 13 F.Supp.2d 130, 134–36 (D.Mass.1998) (Title II applies to employment discrimination claims against public entities); *Motzkin v. Trustees of Boston University,* 938 F.Supp. 983, 996 (D.Mass.1996) ("the legislative intent is so clear from the language of Titles I and III that one need not go beyond that language to conclude that employment discrimination is the exclusive province of Title I"). In evaluating plaintiffs' claim, this Court turns to the statutory language and structure of the ADA as the best source of guidance as to what the intent of Congress was in formulating such provisions.

■ At the outset, this Court notes that the express language of Title I makes abundantly clear that employment related concerns under the ADA are the exclusive province of Title I. *See Motzkin,* 938 F.Supp. at 996. The operative language of Title I states, "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

Notwithstanding the explicit language of Title I, plaintiffs contend that the plain language and structure of Title II, as well as its legislative history, establish that the reach of this Title also extends to the employment practices of public entities. Using the traditional tools of statutory construction, this Court turns first to the words that Congress chose to include in Title II. *See Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). It is noted that the regulations of the Attorney General indicate that Title II does in fact contemplate employment discrimination claims. However, since the statutory language is unambiguous, this Court, in accordance with the dictates of *Chevron,* finds no need to analyze whether Congress has left a statutory gap such that these administrative regulations should be given deference. *See id.* at 842–43, 104 S.Ct. 2778.

The operative language of Title II provides:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.

42 U.S.C. § 12132. The language of this section of the ADA has two clauses. The first of these clauses focuses on the so-called "outputs" of a public agency. *See Zimmerman,* 170 F.3d at 1174; *Decker v. University of Houston,* 970 F.Supp. 575,

578 (S.D.Tex.1997) ("the phrase 'services, programs, and activities,' ... understood as a whole, focuses on a public entity's outputs rather than inputs.") (Citation and internal quotation marks omitted). The second of these clauses, "or be subject to discrimination by any such entity," reinforces the first clause. *See* 42 U.S.C. § 12132.

Employment by a public entity is not, in the common parlance, thought to be an "output" of a public agency. *See Zimmerman,* 170 F.3d at 1174. Rather, when one thinks of a public entity's services, programs, and activities, one imagines some operation of the agency that is offered for the benefit of the general public. *See id.* (characterizing the programs, services, and activities of the Parks Department as operating a swimming pool or conducting nature walks). Therefore, the plain wording of the first clause suggests that Congress did not intend that it apply to employment. *See id.*

Notwithstanding this interpretation, the majority of courts that have found Title II to apply to employment have done so because of the second clause of this section. *See e.g. Bledsoe,* 133 F.3d at 821–22; *Downs,* 13 F.Supp.2d at 134–36. This second clause can be thought of as the section's "residual" clause. In *Downs,* the Court relied on the residual clause in ruling that plaintiff, a state employed bus driver, could sue for employment discrimination due to his disability under Title II. *See* 13 F.Supp.2d at 134–36. As defendants suggest, such an interpretation would consume the entire provision rendering the main clause unnecessary. Under such a broad interpretation, there would be no need for the main clause's specific restrictions. The dependent clause would mandate a seemingly endless proscription of discrimination. *See Circuit City Stores v. Adams,* 532 U.S. 105, 121

S.Ct. 1302, 1308–09, 149 L.Ed.2d 234 (2001) ("[w]here general words follow specific words in statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words"); *Connecticut National Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("courts should disfavor interpretations of statutes that render language superfluous").

To prevail on a Title II claim, plaintiffs must prove that he or she is a "qualified individual with a disability." 42 U.S.C. § 12132. Title II states:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modification to rules, polices, or practices, the removal of architectural communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). This language indicates that a plaintiff is not "qualified" to bring any claim under Title II unless he or she "meets the essential eligibility requirements" of a government service, program, or activity provided by a public entity. 42 U.S.C. § 12131(2). Therefore, the residual clause in question must necessarily relate to the "outputs" that are governmental services, programs or activities, otherwise a plaintiff is not "qualified" to bring a claim under Section 12132. *See Zimmerman,* 170 F.3d at 1175. If the opposite were true, and the residual clause extended beyond the particularized "outputs" of public entities, Section 12132 would be rendered meaningless. This result, as plaintiffs encourage, would mean that the language of the residual clause would stand apart from the very definition of individu-

als that Congress sought to have Title II protect. Aside from the procedural difficulty of not knowing who, in the absences of definitions, would be qualified to bring an action under this clause, it defies the rules of statutory construction to read one clause in isolation of the carefully crafted definitions Congress intended to apply to the whole section.

The language of Title II's two clauses indicates that Congress intended to prevent two distinct occurrences, namely, the exclusion/denial of benefits by a public entity on the one hand, and discrimination by a public entity on the other. *See id.; Crowder v. Kitagawa,* 81 F.3d 1480, 1483 (9th Cir.1996). As such, the two clauses differ only in their method of prohibiting discrimination. The second clause prohibits intentional discrimination, whereas the first clause prohibits disparate treatment of the disabled. *See id.*

Supporting this reading of the language of Title II is the overall structure of the ADA. *See National R.R. Passenger Corp., v. Boston & Maine Corp.,* 503 U.S. 407, 417, 112 S.Ct. 1394, 1401–02, 118 L.Ed.2d 52 (1992) (in interpreting the meaning of a statute, a court must look to the structure and language of the statute as a whole). In plaintiffs' view, the structure of the ADA supports a claim for employment discrimination under Title II. However, the lines of demarcation in the ADA are clear. *See PGA Tour, Inc. v. Martin,* 531 U.S. 1049, 121 S.Ct. 1879, 1888, 149 L.Ed.2d 904 (2001) ("to effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II) and public accommodations (Title III)"; *id.* at 1897–98 (Scalia, J., dissenting)) ("the ADA has three *separate* titles: Title I covers employment discrimination, Title II covers discrimination by government entities, and

Title III covers discrimination by places of accommodation") (emphasis added). Thus, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 356 n. 1, 121 S.Ct. 955, 960 n. 1, 148 L.Ed.2d 866 (2001) (quotation omitted). *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *Patterson v. Illinois,* 35 F.Supp.2d 1103, 1108 (C.D.Ill. 1999) (Titles I and II were enacted by the same Congress on the same day, indicating a strong presumption against an overlap between two explicit frameworks). To say that the structure of the ADA supports the conclusion urged by plaintiffs would disrupt the balance that Congress has set forth in this area and further a statutory reading that disfavors the procedures that Congress best feels will provide for the vindication of individual's rights. *See Zimmerman,* 170 F.3d at 1178 (indicating that a convergence of the two Titles in the employment context would lead states to be subject to conflicting regulation between the EEOC on the one hand (Title I) and the Attorney General on the other (Title II)); *Patterson,* 35 F.Supp.2d at 1109 (a claim under Title II does not afford the public employer and the EEOC an opportunity to settle the dispute through conference and conciliation prior to the public employee seeking relief in federal court).

**B.   The "Safe Harbor Provision"**

Assuming, *arguendo,* that an analysis of Title II supported a claim for employment discrimination, defendants would still be entitled to summary judgment by virtue of the "safe harbor provision" included in the ADA. *See* 42 U.S.C. § 12201(c).   The safe

harbor provision states that courts "shall not" construe the ADA to prohibit or restrict covered entities from "establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with state law." *Id.*

The safe harbor provision was designed to prevent the second-guessing of legitimate classifications used in the underwriting of a given plan. In the matter before this Court, there is no dispute that the GIC's LTD plan qualifies as a bona fide benefit plan. Moreover, there is no indication that the plan violates any state law. Rather, the issue is whether the classifications made in the plan are rational ones, or merely a pretext to effectuate a form of discrimination.

At the outset, there is no requirement that defendants produce any actuarial analysis to justify their underwriting decisions. *See Rogers v. Department of Health and Environmental Control,* 174 F.3d 431, 437 (4th Cir.1999) (safe harbor provision of the ADA does not require a plan's separate classification of mental disability to be proved with actuarial data); *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 611 (3rd Cir.1998) (a court should not be elevated to the position of super-actuary); *Doukas v. Metropolitan Life Insurance Co.,* 950 F.Supp. 422, 428 (D.N.H. 1996). To claim benefits under this provision, a covered entity must show that the insurance decision was related to some "actual or reasonably anticipated experience." *Doukas,* 950 F.Supp. at 428.

Here, the record indicates that the GIC and the Hartford had been discussing the expansion of mental/nervous disability since at least 1994. Based on consultations, and given the collective underwriting experience of those concerned, such an expansion was deemed unworkable. The principle of adverse selection, well articulated in the field of insurance underwriting, served as a guidepost to this decision. According to OFJ consultants, adverse selection occurs when an employee has a choice among benefit plans, he or she will invariably make the right choice for themselves and that if a choice exists among benefit plans providing different levels of benefits an employee is likely to use, the employee will enroll in the plan providing the highest level of benefits. As a result, the cost of the plan providing the highest level of benefits is going to increase above what the cost would be if all eligible employees were enrolled in that plan because now the plan would cover a higher percentage of those that are going to utilize the benefit. After the cost of the plan increases significantly, employees who may not be able to afford the plan will drop out. This will leave in the plan only those who believe they are likely to be disabled from conditions covered in the plan. This will lead to yet another increase in the cost of the plan prompting still more employees to drop out. As the cycle continues, the plan eventually loses viability.

Plaintiffs dismiss the concept of adverse selection as an unproven theory that has no application to this case. Yet, what is required is not absolute scientific certainty on the part of defendants. Rather, what is needed is a rational nexus, based on underwriting experience, between the formation of the plan and the classifications made. The record is clear that the denial of benefits to mentally disabled outpatients for more than one year was the product of a concern for the long-term security of this portion of the GIC's LTD program. The fact that such extensive consultations took place on this very subject is an indication that the ultimate determinations made by both the GIC and the Hartford were in

accordance with practical underwriting experience. As defendants have met their burden of showing that the LTD classifications were rationally related to their purpose of promoting a sustainable plan, and such classifications are not in violation of any state anti-discrimination statute, this Court rules, as a matter of law, that defendants have availed themselves of the benefits of the safe harbor provision.

### IV. Plaintiffs' Constitutional Claims

In rejecting the constitutional claims found in plaintiffs' motion, this Court uses a line of reasoning similar to that used in the analysis of whether defendants qualify for safe harbor protection under the ADA. The touchstone is again the rational relationship between the underwriting decisions made and the legitimate ends that were sought. See *Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 219 (1st Cir.1994).

■■■ The thrust of plaintiffs' equal protection claim is that the GIC's LTD plan treats as unequal those mentally disabled patients who are committed to an institution and those who are treated on an outpatient basis. With respect to such a claim, it is well established that, for purposes of this analysis, the disabled do not constitute a suspect classification. See *Heller v. Doe By Doe*, 509 U.S. 312, 321, 113 S.Ct. 2637, 2644–45, 125 L.Ed.2d 257 (1993); *accord City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 442–47, 105 S.Ct. 3249, 3255–58, 87 L.Ed.2d 313 (1985) (mental retardation not a "quasi-suspect classification"). As such, the lenient rational basis standard will apply.[7] In this matter there is strong evidence that the disputed limitations of LTD coverage for mental disabilities are rationally related to the goal of protecting the pro-

gram's overall viability. Additionally, it is certainly true that maintaining a workable disability plan for the Commonwealth's employees, accomplished in part by keeping premiums at an affordable level, is a legitimate state interest. Therefore, this Court rules that defendants have not set up a system of administering disability benefits that violates the Equal Protection Clause.

■■■ Similarly, defendants have not violated he plaintiffs' substantive due process rights. Initially, the same analysis with respect to the rationality of defendants' actions and the legitimate ends pursued by the Commonwealth will apply to plaintiffs' substantive due process claim. See *Montalvo–Huertas v. Rivera–Cruz*, 885 F.2d 971, 976 n. 7 ("the type and kind of scrutiny applied, and the result, would be no different on either theory"). Thus, plaintiffs fare no better under this theory.

As the Court of Appeals for the First Circuit has noted, two alternative theories of substantive due process have been articulated by the Supreme Court. See *Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.1991). These theories also fail to provide plaintiffs with any relief. This alternative approach holds that if a plaintiff either (1) demonstrates that the state's conduct "shocks the conscience" or (2) demonstrates a violation of an identified liberty or property interest protected by the due process clause, a due process claim will be successful. See *id.* (citation omitted).

Here, plaintiffs can make no claim that the Commonwealth's failure to provide unlimited LTD benefits shocks the conscience. Moreover, this contention conflicts with the categorical rule that the due process clause generally confers no affir-

---

7. Under this standard, the burden is on plaintiffs to "negate every conceivable basis which might support [the classification], whether or

not the basis has a foundation in the record." *Heller*, 509 U.S. at 320, 113 S.Ct. at 2643.

mative right to government aid. *See De-Shaney v. Winnebago County DSS,* 489 U.S. 189, 196, 109 S.Ct. 998, 999–1000, 103 L.Ed.2d 249 (1989). Such is the case even when governmental aid may be necessary to secure life, liberty, or property interests. *See id.* Indeed, the Court of Appeals for the Second Circuit has applied the principles found in *DeShaney* to rule that individuals with mental disabilities have no independent due process right to funded care from the state. *See Brooks v. Giuliani,* 84 F.3d 1454, 1466–67 (2nd Cir. 1996), *cert. denied,* 519 U.S. 992, 117 S.Ct. 480, 136 L.Ed.2d 375 (1996).

Lastly, plaintiffs' complaint claims that since the procurement of LTD benefits are conditioned upon an "invidious condition" the GIC has violated the due process clause. To be successful, such a claim requires a novel interpretation of due process jurisprudence. The mere novelty of such a claim is reason enough for this Court to decline its application and reaffirm well-established principles of due process clause interpretation. *See Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 1447–48, 123 L.Ed.2d 1 (1993). Thus, since this alleged "invidious condition" is rationally related to a legitimate state interest, a substantive due process claim cannot be supported.

### V. Conclusion

Judges are not super-actuaries and should not tamper with the terms of an insurance contract fully and freely negotiated on behalf of the government employees affected thereby when such terms have a rational basis in insurance underwriting experience and practice. Since plaintiffs can neither sustain a cause of action for employment discrimination under Title II of the ADA, nor make a successful claim under the Fourteenth Amendment, this Court hereby denies their cross-motion for summary judgment. Accordingly, since no

material factual dispute exists, plaintiffs' failure to sustain a cause of action entitles defendants to a grant of summary judgment.

SO ORDERED.