Sue THOMAS, Plaintiff,

v.

James J. NAKATANI, et
al., Defendants.

No. CIV. 00–125 ACK.

United States District Court,
D. Hawai'i.

Oct. 13, 2000.

Michael A. Lilly, Ning Lilly & Jones, Honolulu, HI, for Sue Thomas, plaintiff.

Deborah Day Emerson, Office of the Attorney General–Hawaii, Honolulu, HI, for James J. Nakatani, Dept. of Agricul-

ture, State of Hawaii, John Does 1–10, Doe Government Agencies 1–10, defendants.

### ORDER GRANTING IN PART, DENYING IN PART, AND STAYING CONSIDERATION IN PART OF DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

KAY, District Judge.

#### BACKGROUND

Sue Thomas ("Plaintiff") is profoundly deaf and navigates her way through life with the assistance of her hearing guide dog, "Amazing Grace." Plaintiff is an inspirational speaker and it is in that role that she visited Hawaii in 1999, accompanied by Amazing Grace. The instant case arises from Plaintiff and Amazing Grace's encounter with Hawaii's animal quarantine laws. Plaintiff alleges that in the course of enforcing the animal quarantine laws, James J. Nakatani, both in his individual and his official capacities as the Chairman of the Board of Agriculture, State of Hawaii; the Department of Agriculture of the State of Hawaii ("DOA"); and the State of Hawaii ("State") (collectively, "Defendants") all deprived her of various constitutional, statutory, and common law rights. Plaintiff brings this action on behalf of the class of "all deaf Americans who desire to freely travel to and/or from Hawaii for business and/or pleasure with their hearing dogs exempt from Hawaii's Animal Quarantine requirements." Compl. ¶¶ 6–7.

#### Statutory Background

Pursuant to the authority granted it under H.R.S. § 142–2, the DOA has promulgated rules for dealing with animal diseases and quarantine. These rules appear in the Hawaii Administrative Rules ("H.A.R."), Title 4, Chapter 29. Their objective "is to prevent the introduction of rabies into the State through quarantine of cats, dogs, and other carnivores entering the State." H.A.R. § 4–29–1.[1] Section 4–

---

1. Defendants provided the Court with two versions of the H.A.R., one predating the July

29–9 establishes a 120–day quarantine[2] for carnivores entering Hawaii from the United States mainland or from any other country that has not been designated by the DOA as rabies-free. *See* H.A.R. § 4–29–9. The rules apply to both visitors and returning residents. *See* H.A.R. § 4–29–8(6).[3] The Ninth Circuit recently held that the old version of the H.A.R. violated the ADA with respect to the treatment of blind persons wanting to enter the state with guide dogs. *Crowder v. Kitagawa,* 81 F.3d 1480, 1481 (9th Cir.1996) ("Hawaii's quarantine requirement effectively prevents [visually-impaired individuals who rely on guide dogs] from enjoying the benefits of state services and activities in violation of the ADA."). Subsequent to the *Crowder* decision, the H.A.R. have been amended (as recently as July of 2000) to provide new exemptions for, *inter alia,* blind and deaf users of service dogs. *See* H.A.R. §§ 4–29–20 through 4–29–26 (current version). It is undisputed that the requirements to gain an exemption for non-blind service dog users are more strict. *See id.* The current exemptions for deaf users of service dogs were not available in April of 1999 when Plaintiff

traveled to Hawaii. *See* Mot., Nakatani Decl, Ex. 4.

### Plaintiff's Claims of Injury

Plaintiff filed her second amended complaint[4] ("Complaint") on August 17, 2000. The following background is taken from the Complaint and declarations filed by the parties, as well as Defendants' CSF.[5] According to Plaintiff, she and Amazing Grace are an "inseparable team." Compl. ¶ 9. "Amazing Grace has been trained to perform life-important tasks for [Plaintiff's] benefit that she could not otherwise do by herself. [Plaintiff] cannot function in the world independently, freely, safely, flexibly and with dignity without her inseparable companion, Amazing Grace."*Id.; see also* Pl. Decl. ¶ 3 (attached to Opp.). Amazing Grace had received all appropriate vaccinations, including those for rabies. *See* Pl. Decl. ¶ 3.

Plaintiff flew to Hawaii on April 26, 1999 for the purpose of delivering a speech.[6] Upon arrival at Honolulu International Airport, Plaintiff and Amazing Grace were taken to the airport quarantine station where, according to the Complaint, they were "detained." *See* Compl. ¶ 11.[7] Ini-

---

2000 amendments, *see* Motion, Nakatani Decl., Ex. 3, and one version that incorporates the July 2000 amendments, *see* Motion, Nakatani Decl., Ex. 4. Unless otherwise noted, the sections are identical in either version.

2. Under both the old and current rules, following certain pre-shipment requirements results in the imposition of only a thirty day quarantine. *See* H.A.R. § 4–29–8.1.

3. In the old rules, this provision appeared at H.A.R. § 4–29–8(8).

4. The Complaint lists seven causes of action: 1) the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.;* 2) the Rehabilitation Act, 29 U.S.C. § 794; 3) 42 U.S.C. § 1983 (right to travel, right to equal protection, and right to substantive due process); 4) negligent/intentional infliction of emotional distress; 5) false imprisonment; 6) abuse of discretion; and 7) invasion of privacy.

5. The instant Motion strikes a strange procedural posture. Defendants explain that the motion is one to dismiss as to "all State

Defendants," and in addition, one for summary judgment as to Nakatani in his individual capacity on the grounds of qualified immunity. *See* Mot., at 2. The Court assumes that any other defenses put forth by Nakatani are asserted as part of the motion to dismiss. Plaintiff did not file a CSF. *See* L.R. 56.1(g). Accordingly, for the purposes of the summary judgment part of the Motion, the Court deems as admitted all the facts stated in Defendants' CSF, other than as controverted by declarations submitted by Plaintiff.

6. Prior to traveling to Hawaii, she informed Defendants of her itinerary, her disability, and that she would be bringing Amazing Grace.

7. Defendants maintain that "Plaintiff was never personally detained or restricted as to her own movements." CSF ¶ 3; *see also* Nakatani Decl. ¶ 7 (attached to CSF). Plaintiff says that she was "detained" at the station. *See* Pl. Decl. ¶ 5. To the extent this is a motion to dismiss, the allegation in the Complaint governs. To the extent that this is a motion

tially Plaintiff was not allowed to leave the airport with Amazing Grace and go to her hotel. Defendants gave Plaintiff the option of either staying at the quarantine station cottage or the airport quarantine station if she wished to be with Amazing Grace. According to Aileen Wakayama, the supervisor of the airport quarantine facility, Plaintiff insisted on remaining at the airport facility[8] to be with Amazing Grace. Waykayama Decl. ¶4 (attached to Motion).

After the decision was made that Plaintiff would stay at the airport quarantine station, a mattress, blankets, and pillows were placed on the floor for her and Amazing Grace. See Compl. ¶12; Pl. Decl. ¶6.[9] Later that evening, Plaintiff demanded to see the Acting Quarantine Station Manager, Dr. James F. Foppoli, and the Animal Quarantine Branch Program Manager, Dr. Dewey Sturges. See Compl. ¶12; Pl. Decl. ¶6. At 11:20 p.m. that night, Drs. Foppoli and Sturges, on behalf of the DOA, released Amazing Grace on provisional quarantine to Plaintiff's hotel room. See Compl. ¶13; Pl. Decl. ¶7; Opp., Ex. T; Wakayama Decl. ¶6. Amazing Grace was only permitted to leave the room to relieve herself in designated areas of the hotel grounds. See Compl. ¶13; Pl. Decl. ¶7.

The terms of the provisional quarantine included that inspections be conducted by animal quarantine employees to confirm that Amazing Grace was indeed present in the room in compliance with the agreement. See Compl. ¶13 & Ex. A; Wakayama Decl. ¶6; Opp., Ex. T. Plaintiff contends that she was subject to inspections at any time and that through her five day stay, twelve visits were made. See Compl.

¶13; Pl. Decl. ¶8. Inspections were made whether Plaintiff was present in the room or not—if Plaintiff did not answer the door, hotel security let the investigators into the room. See Wakayama Decl. ¶7; Pl. Decl. ¶8. Plaintiff spent most of her time in Hawaii in the hotel room with Amazing Grace, afraid to be away both because she relied heavily on Amazing Grace for her personal safety and out of concern for the effect separation would have on the dog's well-being. See Compl. ¶14; Pl. Decl. ¶9.

Plaintiff's speech was scheduled for May 1, 1999. Although Plaintiff contends that initially, Defendants did not agree to let Amazing Grace attend the speech, eventually the dog was permitted to leave the hotel and participate in Plaintiff's presentation. See Compl. ¶15; Pl. Decl. ¶10; Nakatani Decl. ¶7. An inspector from the DOA accompanied Amazing Grace and Plaintiff. See Compl. ¶15; Pl. Decl. ¶10.

Plaintiff left Hawaii later on the day of May 1, 1999. Plaintiff met with Dr. Foppoli at the airport who, according to Plaintiff, told her that she would never be able to return with Amazing Grace until the laws were changed. See Compl. ¶17; Pl. Decl. ¶11. After Plaintiff boarded her plane, she opened an envelope a friend had given her, containing a letter dated April 29, 1999 from Nakatani. See Compl. ¶18; Pl. Decl. ¶12. The letter stated that the provisional quarantine agreement reached with Drs. Foppoli and Sturges on April 26, 1999 which exempted Amazing Grace from the quarantine requirements was "not valid," "made without legal authority," and "hereby repudiated." See Compl., Ex. A.; Opp., Ex. T. The letter also stated that

for summary judgment, however, the Court deems the fact to be in dispute—Defendants' CSF has been controverted by declarations submitted by Plaintiff.

8. Plaintiff alleges that during the events at the airport quarantine facility, she requested a Telephone Device for the Deaf ("TDD"), but was told that the quarantine officials did not have one. See Compl. ¶11; Pl. Decl. ¶5.

According to Wakayama, Plaintiff was taken to use a TDD machine in the interisland terminal of the airport. Waykayama Decl. ¶4.

9. Wakayama explained that the mattress and bedding were brought from one of the employee's homes for Plaintiff, as the airport quarantine station was not equipped to be a residential or a lounge facility. See Wakayama Decl. ¶5.

Amazing Grace must be taken to the Halawa quarantine station until either the end of the 120–day quarantine period, or until Plaintiff left Hawaii, and that Plaintiff could stay at either Halawa or the hotel. *See id.* The letter stated that failure to comply could result in fines or imprisonment or both.[10]

Plaintiff subsequently received a document dated June 18, 1999 from the District Court for the First Circuit of the State of Hawaii and entitled "Notice of Failure to Respond to Animal Industry Violation." *See* Compl., Ex. C; Opp., Ex. U. The notice stated that Plaintiff was being fined $525 for "failure to meet post shipment requirements," i.e., removing Amazing Grace from the airport quarantine station on April 26, 1999. *See id.*[11] Plaintiff is "fearful that if she returns to Hawaii she will be arrested, imprisoned, and separated from her inseparable companion, Amazing Grace." *See* Compl. ¶ 10. Plaintiff alleges no desire or plans to return to Hawaii in either the Complaint or the Opposition.

According to Nakatani, he has never met Plaintiff, but in his position as Chairman of the Board of Agriculture, he was informed of the agreement to allow Amazing Grace to have provisional quarantine at Plaintiff's hotel. *See* CSF ¶ 1. He also states that the Animal Quarantine Program of the Division of Animal Industry does not receive any federal financial assistance. *See* CSF ¶ 4. Moreover, Nakatani avers that in his individual capacity he does not receive or control the receipt of any federal financial assistance in any way related to the animal quarantine program. *See id.* To the extent that this is a motion for summary judgment, neither of these facts were refuted by Plaintiff and are therefore deemed admitted. *See* L.R. 56.1. Finally, in defense of the quarantine program, Nakatani stated that,

> Hawaii is a rabies-free state. The quarantine statutes and administrative rules are intended to protect the public health and safety by assuring that the state remains rabies-free, specifically by preventing animals from being brought into the state without the assurance of a quarantine period or strict control to prevent exposure or transmission to other animals.

Nakatani Decl. ¶ 6. He also informed the Court that the Hawaii Administrative Rules governing quarantine for service and guide dogs were amended effective July 12, 2000. *See id.* ¶ 10.[12]

Defendants filed the instant Motion to Dismiss or for Summary Judgment and an accompanying Concise Statement of Facts

---

10. According to Nakatani, he wrote the letter after being advised by counsel that the agreement to allow Amazing Grace go to the hotel was illegal under state quarantine laws. *See* Nakatani Decl. ¶ 4. Nakatani did not personally deliver the letter and does not dispute that Plaintiff did not read the letter until airborne. *See id.* ¶ 5. As Plaintiff points out, the letter was issued at a time Nakatani knew or should have known that Plaintiff was at the hotel and still subject to DOA inspections. *See* Opp., at 8. Plaintiff also points out that after the issuance of the letter, DOA employees permitted Plaintiff to attend her speech with Amazing Grace. *See id.* The letter was addressed to Plaintiff at her hotel, but its route to Plaintiff is somewhat confused. According to counsel at the hearing on the instant motion, the letter was delivered to a Mr. Max Sword, a friend of Plaintiff. Mr. Sword then relayed the letter to Plaintiff as she departed Hawaii.

11. According to the Opposition (but not included in the Complaint), Nakatani had to review and approve the citation before it was taken to the state court. As support for this argument, Plaintiff attaches a page from the notes of the Animal Quarantine Branch dated May 19, 1999. *See* Opp., Ex. N. Also according to the Opposition, but not included in the Complaint, is the fact that this citation is still outstanding. *See* Tanabe Decl. ¶ 23 (attached to Opp.).

12. Plaintiff opposes the new rules for service and guide dogs, "which allow hearing dogs an exemption only under ·very strict requirements. Those requirements force me to choose between traveling to Hawaii or not traveling to Hawaii while other citizens without disabilities do not have to make that choice." Pl. Decl. ¶ 15.

on August 14, 2000.[13] Plaintiff filed her Opposition on September 14, 2000. Defendants filed their Reply on September 29, 2000. The Motion came before the Court for hearing on October 10, 2000.

## STANDARDS OF REVIEW

### I. MOTION TO DISMISS

Under Rule 12(b)(6), in determining whether a motion to dismiss for failure to state a claim upon which relief can be granted, this Court must accept as true the plaintiff's allegations contained in the complaint and view them in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wileman Bros. & Elliott, Inc. v. Giannini,* 909 F.2d 332, 334 (9th Cir.1990); *Shah v. County of Los Angeles,* 797 F.2d 743, 745 (9th Cir. 1986). Thus, the complaint must stand unless it appears beyond doubt that the plaintiff has alleged no facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir. 1988). A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Balistreri,* 901 F.2d at 699; *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir.1984).

In essence, as the Ninth Circuit has stated, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." *De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). The Court must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of plaintiffs' claims. *Id.*

■ A motion under Rule 12(b)(6) should also be granted if an affirmative defense or other bar to relief is apparent from the face of the Complaint, such as lack of jurisdiction or the statute of limitations. 2A J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice,* ¶ 12.07 at 12–68 to 12–69 (2d ed.1991 & supp. 1191–92) (citing *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)) (emphasis added).

### II. MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The standard for summary adjudication is the same. *See State of Cal. v. Campbell,* 138 F.3d 772, 780 (9th Cir. 1998). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *See id.* at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the non-moving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

---

13. Despite the fact the Second Amended Complaint was not filed until August 17, 2000, the Motion addresses the Second Amended Complaint. A stipulation was entered on August 7, 2000 giving Plaintiff leave to file the Second Amended Complaint.

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See id.* at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics*, 818 F.2d at 1468 (emphasis in original) (citing

*Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W. Elec. Serv.*, 809 F.2d at 630–31.

## DISCUSSION

### I. AMERICANS WITH DISABILITIES ACT

Count I of the Complaint sets forth three alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq. See* Compl. ¶¶ 22–24. Defendants argue that Plaintiff's ADA claims should be dismissed for two reasons: 1) that the ADA is inapplicable to Nakatani in his individual capacity, and 2) that the Eleventh Amendment bars claims under the ADA against the State, the DOA, and Nakatani in his official capacity.

### A. Nakatani May Not be Sued Under the ADA in His Individual Capacity

Defendants argue that Nakatani may not be sued in his individual capacity under the ADA. *See* Mot., at 3. Title II [14] of the ADA prohibits discrimination in programs of a "public entity" or discrimination "by any such entity." *See* 42 U.S.C. § 12132. The ADA defines "public entity" as "any State or local government" or "any department, agency, special purpose district or other instrumentality of a State or States or local government." *See* 42 U.S.C. § 12131(1)(A)-(B).

While the Ninth Circuit has not addressed the issue, the Eighth Circuit has determined that a public actor may not be sued in his or her individual capacity under Title II of the ADA. *See Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8. (8th Cir.1999) (*en banc*), *cert. granted in part*, 528 U.S. 1146, 120 S.Ct. 1003, 145 L.Ed.2d 947 (2000), *cert. dismissed*, 529 U.S. 1001,

**14.** Title II applies to "Public Services" and is the appropriate title of the ADA for Plaintiff's claims. Title I of the ADA applies to "Employment," and Title III applies to "Public Accommodations and Services Operated by Private Entities."

120 S.Ct. 1265, 146 L.Ed.2d 215 (2000). The plaintiff in *Alsbrook* sued, *inter alia,* the commissioners of a law enforcement standards board in their official capacities under the ADA. *See id.* at 1002. In deciding the merits of his ADA claim against the commissioners, the *en banc* court stated,

> It is unclear from the complaint whether Alsbrook is asserting an ADA claim against the commissioners in their individual capacities. To the extent that he is, we agree with the panel opinion's conclusion that *the commissioners may not be sued in their individual capacities directly under the provisions of Title II.* Title II provides disabled individuals redress for discrimination by a "public entity." *See* 42 U.S.C. § 12132. That term, as it is defined within the statute, does not include individuals. *See* 42 U.S.C. § 12131(1).

*Id.* at 1005 n. 8 (emphasis added) (noting that, "no circuit has directly addressed the issue of individual liability under Title II"). The Seventh Circuit recently agreed with *Alsbrook* and adopted its reasoning on this issue. *See Walker v. Snyder,* 213 F.3d 344, 346 (7th Cir.2000) ("In suits under Title II of the ADA ... the proper defendant usually is an organization rather than a natural person.... Thus we agree with [*Alsbrook*] that as a rule there is no personal liability under Title II either."). Although no published [15] decision from this district tackles the issue, a number of other district courts have held that Title II of the ADA does not allow a cause of action against individuals.[16] *See, e.g., Calloway v. Boro of Glassboro Dept. of Police,* 89 F.Supp.2d 543, 557 (D.N.J.2000) (holding that individual liability is not contemplated under Title II of the ADA); *Yeskey v. Commonwealth of Penn.,* 76 F.Supp.2d 572, 574–75 (M.D.Pa.1999) ("individuals are not liable under Title II because it prohibits discrimination in programs of a 'public entity' or discrimination 'by any such entity' and 'public entity' is not defined ... to include individuals") (citations omitted); *Montez v. Romer,* 32 F.Supp.2d 1235, 1241 (D.Colo.1999) ("I conclude that the individual defendants in their individual capacities are not properly subject to suit under the [ADA]"); *but see Niece v. Fitzner,* 922 F.Supp. 1208, 1218–19 (E.D.Mich.1996) (refusing to dismiss claims against individual actors, stated, "There is nothing within Title II which explicitly authorizes or prohibits suits against public actors acting in their official or individual capacities.").

Following the plain language of § 12132, and finding the arguments of *Alsbrook, Walker,* and the majority of the district court opinions to be persuasive, the Court concludes that as a matter of law, an action under Title II of the ADA may not be maintained against public actors in their individual capacities. Plaintiff's citation to *Duffy v. Riveland,* 98 F.3d 447, 452 n. 4 (9th Cir.1996), is unavailing. *Duffy* stands for the noncontroversial concept that if a state lacks sovereign immunity, so too does a state official sued in his official capacity. Defendants' arguments in the instant section concern Nakatani's individual capacity liability under the ADA, not his liability in his official capacity.[17] Accordingly, Plaintiff's ADA claim against Nakatani in his individual capacity is DIS-

---

**15.** The Court does not rely on this unpublished decision, but it does note that Judge Gillmor of this district recently concluded that "individuals cannot be liable under the ADA in their individual capacities." *Vinson v. Thomas,* Civ. No. 97–00091 HG, slip op. at 25 (D.Haw. Feb. 28, 2000) (granting summary judgment to state actor in her individual capacity against Title II claim).

**16.** The Court notes that these courts have not always been careful to distinguish between "individual capacity" (as opposed to "official capacity") and "individual" (as in human being, as opposed to an entity). Either construction, however, supports the argument that there is no liability for an individual person in his "individual capacity."

**17.** The Motion does not contend that this holding should also bar suit against Nakatani in his official capacity under the ADA.

MISSED WITH PREJUDICE. Defendants' Motion to Dismiss is GRANTED on this issue.

### B. Title II of the ADA and the Eleventh Amendment

Under the Eleventh Amendment, a state is not subject to suit by its own citizens or citizens of other states in federal court. *Clark v. California*, 123 F.3d 1267, 1269 (9th Cir.1997). The Eleventh Amendment provides:

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend XI. "Congress can, however, abrogate a state's immunity to suit, or the state can waive it." *Clark*, 123 F.3d at 1269. It is clear that Defendants have not consented to Plaintiff's suit; accordingly, the success of Plaintiff's ADA claim turns on whether Congress abrogated the states' immunity to suit. To determine whether a valid abrogation of sovereign immunity occurred, a court "must answer two questions: first, whether Congress has unequivocally expresse[d] its intent to abrogate the immunity ... and second, whether Congress has acted pursuant to a valid exercise of power." *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savs. Bank*, 527 U.S. 627, 635, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (quotation marks omitted, brackets in original) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)).

Defendants argue at length that Congress did not validly abrogate the states' sovereign immunity when it enacted the ADA and therefore, Plaintiff's suit must be dismissed because Defendants are immune from suit. *See* Mot., at 13–27. Plaintiff argues that the issue is settled in the Ninth Circuit and that Congress did indeed validly abrogate the states' sovereign immunity when enacting the ADA. *See* Opp., at 19–24. Plaintiff is correct that two panels of the Ninth Circuit have held that Congress did validly abrogate states' sovereign immunity when it enacted the ADA. *See Dare v. California*, 191 F.3d 1167, 1174–75 (9th Cir.1999); *Clark*, 123 F.3d at 1270–71. The majority of circuits agree with the Ninth Circuit, but there is a circuit split on the issue. *See, e.g., Dare*, 191 F.3d at 1173 n. 2 (citing cases); *Popovich v. Cuyahoga County Ct. of Common Pleas*, 227 F.3d 627, 640–42 (6th Cir.2000) (finding that Congress exceeded its authority in enacting Title II of the ADA and citing cases in support and to the contrary). Further clouding the issue, since the Ninth Circuit wrote the *Dare* decision, the Supreme Court issued its opinion in *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). In *Kimel*, the Supreme Court held that the abrogation of sovereign immunity in the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, was invalid. *See Kimel*, 120 S.Ct. at 649–50. *Kimel* is the basis for some Circuits having recent doubts about the validity of the abrogation of sovereign immunity in the ADA. *See, e.g., Popovich*, 227 F.3d at 640–42. Earlier this year, the Supreme Court granted certiorari on this exact issue and arguments are scheduled for October 11, 2000, just one day after the hearing on the instant Motion. *See University of Ala. at Birmingham Bd. of Trustees v. Garrett*, 529 U.S. 1065, 120 S.Ct. 1669, 146 L.Ed.2d 479 (April 17, 2000) (granting certiorari); *see also Walker v. Missouri Dep't of Corrections*, 213 F.3d 1035, 1036 n. 2 (8th Cir.2000) (noting that the question presented in *Garrett* is "Does the 11th Amendment bar suits by private citizens in federal court under [the ADA] against nonconsenting states?"). Defendants suggest that a stay is appropriate. Although Plaintiff disagrees, the Court finds that a stay of Plaintiff's ADA claims against the State, the DOA, and Nakatani in his official capacity is the most prudent course of

action. Accordingly, the Court will STAY CONSIDERATION of Defendants' motion to dismiss these ADA claims pending the Supreme Court's decision in *Garrett.*

## II. REHABILITATION ACT

 In Count II of the Complaint, Plaintiff alleges that Defendants' actions violate Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Section 504 states, in pertinent part:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794. To state a claim under § 504, Plaintiff must *allege:* "(1) [s]he is an 'individual with a disability'; (2)[s]he is 'otherwise qualified' to receive the benefit; (3)[s]he was denied the benefits of the program solely by reason of [her] disability; and (4) the program receives federal financial assistance." *Weinreich v. Los Angeles County Metro. Transp. Auth.,* 114 F.3d 976, 978 (9th Cir.1997) (footnote omitted).

Defendants argue that Plaintiff's § 504 claim fails as a matter of law because none of Defendants receive federal financial assistance. The Court assumes that Defendants are moving only for dismissal on this cause of action, *see* Mot., at 2, and agrees. Plaintiff's claim against Defendants must be dismissed because she fails to allege the fourth required element of a claim under *Weinreich.* Nowhere in the Complaint (which is of course, her Second Amended Complaint) does she allege that the program receives federal financial assistance. Accordingly, Plaintiff fails to state a claim upon which relief can be granted under § 504 and her second cause of action is DISMISSED WITHOUT PREJUDICE.

 Acknowledging that in order for Defendants to be liable under § 504 they must receive federal financial assistance, Plaintiff requests a continuance under Rule 56(f) to obtain discovery on the issue. *See* Opp. at 30. The Court DENIES Plaintiff's request. The motion is one for dismissal, not summary judgment on this issue and therefore, a Rule 56(f) continuance is inapplicable. Plaintiff's request for a Rule 56(f) continuance is DENIED.

## III. 42 U.S.C. § 1983

Plaintiff's third cause of action asserts a claim under 42 U.S.C. § 1983 and alleges that various constitutional rights of hers have been violated, namely, her rights to travel, equal protection, and substantive due process. *See* Compl. ¶ 29–32. Section 1983 provides, in part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

 In order to state a cause of action under § 1983, a plaintiff must show (1) that a person acting under color of state law engaged in the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the constitution or laws of the United States. *See Leer v. Murphy,* 844 F.2d 628, 632–33 (9th Cir.1988). A person deprives another of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains. *See id.* at 633.

 The Supreme Court has expressly stated that § 1983 "imposes liability for

violations of rights protected by the Constitution, not for duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles." *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). "Finally, a plaintiff must allege facts, not simply conclusions, that show an individual was personally involved in the deprivation of his civil rights. Liability under § 1983 must be based on the personal involvement of the defendant." *See Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998).

## A. The State and the DOA

 Defendants argue that the State and the DOA should be dismissed because the § 1983 claims against them are barred by the Eleventh Amendment. Plaintiff does not even contest this argument. It is well settled that claims under § 1983 are limited by the scope of the Eleventh Amendment. In *Will v. Michigan Department of State Police,* the Supreme Court held that "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes" are not "persons" under § 1983. *Will,* 491 U.S. 58, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Accordingly, the Court DISMISSES WITH PREJUDICE the § 1983 claims against the State. Similarly, the Court DISMISSES WITH PREJUDICE the § 1983 claim against the DOA—the DOA is clearly an "arm of the state" and is not a "person" for § 1983 liability either.

## B. Defendant Nakatani

Defendants also argue that the § 1983 claims should be dismissed as to Nakatani in both his official and individual capacities. They alternatively argue that Nakatani is entitled to summary judgment on

18. To the extent prospective injunctive relief is sought, the Court notes that a request for an injunction against the enforcement of the Hawaii Administrative Rules in force when Plaintiff visited Hawaii would be moot. Accordingly, the Court construes the request to

the § 1983 claim against him in his individual capacity because he is entitled to qualified immunity.

## 1. Official Capacity

 The Supreme Court has held that a suit against a state official in his official capacity is no different from a suit against the state itself; thus, state officials sued in their official capacities are not "persons" within the meaning of § 1983 either. *See id.* at 71, 109 S.Ct. 2304. When sued for prospective injunctive relief, however, a state official in his official capacity is considered a "person" for § 1983 purposes. *See id.* at 71 n. 10, 109 S.Ct. 2304; *see also Han v. United States Dep't of Justice,* 45 F.3d 333, 338 (9th Cir.1995) (the Eleventh Amendment does not prohibit suits against state officials based upon federal law when only prospective injunctive relief is sought). Accordingly, to the extent that the Complaint seeks retrospective or compensatory relief for violations of § 1983 against Nakatani in his official capacity, such a claim is barred by *Will* and *Han* and it is DISMISSED WITH PREJUDICE.

 The Court now turns to Plaintiff's claim for prospective injunctive relief against Nakatani in his official capacity.[18] The Supreme Court's ruling in *Garrett* may narrow the issues the Court needs to address, avoiding the need to rule on the constitutionality of the quarantine rules. "It is a fundamental rule of judicial restraint that federal courts ought not to pass on questions of constitutionality unless such adjudication is unavoidable." *Crowder,* 81 F.3d at 1486 (quotation marks and alterations omitted). Accordingly, the Court STAYS CONSIDERATION of this claim pending *Garrett.* Additionally, in the hearing on the instant motion, the

be one for an injunction against the prospective use/implementation of the newly amended administrative rules on quarantine which include, of course, exemptions for the deaf who use service dogs.

Court GRANTED Plaintiff leave to file a further declaration with respect to her intentions to return to Hawaii. Plaintiff must file such declaration within thirty (30) days of the issuance of this Order.

## 2. Individual Capacity

For the same reasons that the Court stayed consideration of Plaintiff's § 1983 claims against Nakatani in his official capacity for prospective injunctive relief, it STAYS CONSIDERATION of Plaintiff's § 1983 claims against Nakatani in his individual capacity pending the Supreme Court's decision in *Garrett.*[19]

## IV. STATE LAW CLAIMS

In Counts IV, V, VI, and VII, Plaintiff asserts a variety of state law causes of action. It appears from the Complaint that Counts IV and VI are only levied against Nakatani and that Counts V and VII are alleged against all Defendants. Regarding Nakatani, the Court assumes that the claims are brought in both his official and his individual capacities.

### A. The Eleventh Amendment Bars Plaintiff's State Law Claims Against the State and the DOA

█ "It is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Because the State and the DOA have not consented to suit, Plaintiff's state law claims against them are DISMISSED WITHOUT PREJUDICE.

19. The Court notes that Defendants indicated to the Court that they may withdraw the citation issued to Plaintiff for violating the post-shipment requirements.

20. The Reply raises the defense of qualified immunity from state law torts under *Towse v. State,* 64 Haw. 624, 647 P.2d 696 (1982), and

### B. The Eleventh Amendment Bars Plaintiff's State Law Claims Against Nakatani in his Official Capacity

█ "[T]he [E]leventh [A]mendment bars suits in federal court, for *both* retrospective and prospective relief, brought against state officials acting in their official capacities alleging a violation of state law." *Pena,* 976 F.2d at 473 (emphasis added) (citing *Pennhurst,* 465 U.S. at 106, 104 S.Ct. 900). To the extent that Plaintiff asserts Counts IV—VII against Nakatani in his official capacity, these claims are DISMISSED WITHOUT PREJUDICE.

### C. Plaintiff's State Law Claims Against Nakatani in his Individual Capacity

With the exception of their supplemental jurisdiction argument, discussed *infra,* Defendants' Motion does not raise a challenge to Plaintiff's state law claims against Nakatani in his individual capacity.[20] While they make general arguments in the Motion about the Eleventh Amendment and the State Tort Liability Act ("STLA"), H.R.S. § 662–1 *et seq.,* they concede in the Reply that neither the Eleventh Amendment nor the STLA bar claims against a state actor in his individual capacity. *See* Reply, at 10; *see also Ashker v. California Dep't of Corrections,* 112 F.3d 392, 394–95 (9th Cir.1997) (allowing suit to go forward in federal court against prison officials in their individual capacities for state common law assault and battery); *Pena,* 976 F.2d at 473–74 ("We conclude that the [E]leventh [A]mendment will not bar pendent state claims by [a plaintiff] against state officials acting in their individual capacities."). Accordingly, to the extent that Defendants moved to dismiss Plaintiff's state law claims against Nakatani in his

*Medeiros v. Kondo,* 55 Haw. 499, 522 P.2d 1269 (1974). *See* Reply, at 10. However applicable this defense may be to Nakatani in his individual capacity, an argument raised for the first time in a reply memorandum must be disregarded. *See* L.R. 7.4.

individual capacity, their motion is DE-NIED.

### D. Supplemental Jurisdiction

█ Finally, Defendants request that the Court decline supplemental jurisdiction over Plaintiff's state law claims. The Court has not dismissed all of Plaintiff's federal claims and retention of jurisdiction over her state law claims is appropriate for the time being. *See* 28 U.S.C. § 1367(a). The Court will revisit this issue in the future, however, if Plaintiff's federal claims are later dismissed. The Motion is DE-NIED insofar as it seeks to have this Court decline supplemental jurisdiction over Plaintiff's state law claims.

### *CONCLUSION*

For the foregoing reasons, the Court GRANTS IN PART, DENIES IN PART, and STAYS CONSIDERATION IN PART of Defendants' Motion to Dismiss or for Summary Judgment. Plaintiff has thirty (30) days from the issuance of this order to file a third amended complaint and/or to file further declarations as to her intent to return to Hawaii.

IT IS SO ORDERED.