TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 23-1002 |
| of | : | |
| | : | July 24, 2024 |
| ROB BONTA | : | |
| Attorney General | : | |
| | : | |
| CATHERINE BIDART | : | |
| Deputy Attorney General | : | |

The HONORABLE ELENI KOUNALAKIS, LIEUTENANT GOVERNOR, has requested an opinion on a question relating to the federal Americans with Disabilities Act and the California open meetings law known as the Ralph M. Brown Act.

## QUESTION PRESENTED AND CONCLUSION

Under the Ralph M. Brown Act, a local agency's legislative body must generally conduct its meetings in person at locations open to the public. Does the Americans with Disabilities Act (ADA) nonetheless require that a local agency's legislative body allow remote participation for a member with a qualifying disability that precludes their in-person attendance at meetings of the body?

Yes. The ADA generally requires a local agency's legislative body to allow remote participation as a reasonable accommodation for a member with a qualifying disability that precludes their in-person attendance at meetings of the body. This duty to reasonably accommodate is subject, however, to the Brown Act's requirement that the remote participation must be conducted in a manner that simulates in-person attendance at meetings held in person at a location open to the public. To accomplish this, the Act requires that individual members who participate remotely (1) use two-way video and audio streaming in real time and (2) disclose the identity of any adults who are present

1

with the member at the remote location.  These two requirements should be applied to members who attend meetings remotely due to a qualifying disability.

## BACKGROUND

The question before us involves the ADA, a federal law, and the Brown Act, a state law.[1]  "Congress enacted the ADA in 1990 to remedy widespread discrimination against" people with disabilities.[2]  Congress enacted amendments to the ADA in 2008 that reasserted that purpose.[3]  In furtherance of its purpose, the ADA generally requires "reasonable accommodation" be made in employment, government services, and public accommodations for individuals with disabilities.[4]  In the employment context, for example, a reasonable accommodation could be a modified work schedule.[5]  Determining what constitutes a reasonable accommodation in any given scenario is a fact-intensive, individualized, case-by-case inquiry.[6]

---

[1] This question is implicated in a pending case in the United States District Court for the Northern District of California, *Fischer v. City of Berkeley*, 3:23-cv-04280-TSH.  It appears that no decision will be issued soon, if at all, in that case:  the district court postponed the deadline for responding to the complaint multiple times in anticipation of possible settlement and referred the case to mediation, which has been completed.  As of the date of publication of this opinion, the case docket reflects that the case settled in mediation, and a dismissal or status report is due September 20, 2024.

[2] *PGA Tour, Inc. v. Martin* (2001) 532 U.S. 661, 674; see Pub.L. 101-336, § 2 (July 26, 1990), 104 Stat. 327; 42 U.S.C. § 12101.

[3] Pub.L. 110-325, §§ 1-2 (Sept. 25, 2008), 122 Stat. 3553.

[4] See, e.g., 42 U.S.C. §§ 12112(b)(5) (employment), 12182(b)(2)(A)(ii) (public accommodations); 28 C.F.R. § 35.130(b)(7)(i) (government services); see also *Where Do We Go Berkeley v. Cal. Dept. of Transportation* (9th Cir. 2022) 32 F.4th 852, 860 fn. 4 (stating that "reasonable accommodation" in Title I of ADA and "reasonable modification" in Title II of ADA "create identical standards and may be used interchangeably," quoting *Payan v. L.A. Cmty. Coll. Dist.* (9th Cir. 2021) 11 F.4th 729, 738 fn. 4).

[5] See generally 42 U.S.C. § 12111(9) (referring to job restructuring and modifying facilities, schedules, and equipment, as examples); 29 C.F.R. § 1630.2(o)(2)(ii) (same).

[6] *McGary v. City of Portland* (9th Cir. 2004) 386 F.3d 1259, 1270; *Crowder v. Kitagawa* (9th Cir. 1996) 81 F.3d 1480, 1486; see also *Zivkovic v. Southern Cal. Edison Co.* (9th Cir. 2002) 302 F.3d 1080, 1089 ("[E]mployer is not obligated to provide" employee's preferred accommodation but "need only provide some reasonable accommodation," quoting *E.E.O.C. v. Yellow Freight Sys. Inc.* (7th Cir. 2001) 253 F.3d 943, 951); see, e.g.,

(continued…)

23-1002

The Legislature enacted the Ralph M. Brown Act in 1953 "to ensure the public's right to attend the meetings of public agencies."[7] In furtherance of that purpose, the Act generally requires legislative bodies of local agencies to hold their meetings in person at locations open to the public.[8]

As to the interplay of these laws, the ADA plainly preempts contrary state law.[9] But state law can be relevant to determining what the ADA requires.[10] That means that

*Pruett v. Ariz.* (D. Ariz. 2009) 606 F.Supp.2d 1065, 1068, 1079 (rejecting plaintiff's accommodation claim for chimpanzee as service animal because plaintiff had not shown it "more adequately meets her disability-related needs than several alternatives," and had conceded "even this mild-mannered, affable Chimpanzee could become aggressive" and is likely to grow too big to be a service animal).

[7] *Freedom Newsp. Inc. v. Orange Co. Employees Ret. Sys.* (1993) 6 Cal.4th 821, 825; Stats. 1953, ch. 1558, § 1 (initial enactment of statutory scheme); Stats. 1961, ch. 115, § 1 (naming statutory scheme "Ralph M. Brown Act").

[8] See, e.g., Gov. Code, § 54953, subd. (a) ("All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter"); *id.*, subd. (b)(3) (requiring teleconferencing locations be accessible to public); see also *id.*, § 54950 (reciting that "agencies in this State exist to aid in the conduct of the people's business" and proclaiming "[i]t is the intent of the law that their actions be taken openly and that their deliberations be conducted openly"). The requirement for agency meetings to be open to public scrutiny is also enshrined in the California Constitution. (Cal. Const., art. I, § 3, subd. (b)(1) ("meetings of public bodies . . . shall be open to public scrutiny").)

[9] *Shavelson v. Bonta* (N.D. Cal. 2022) 608 F.Supp.3d 919, 926 (stating that ADA "'requires preemption of inconsistent state law' when necessary to comply with its command—including the ADA's command that state and local governments provide 'reasonable modification[s]' to their programs in certain circumstances," quoting *Mary Jo C. v. New York State & Local Retirement System* (2d Cir. 2013) 707 F.3d 144, 163; *Crowder v. Kitagawa, supra*, 81 F.3d 1480, 1485 ("When a state's policies, practices or procedures discriminate against [people with disabilities] in violation of the ADA, Department of Justice regulations require reasonable modifications in such policies, practices or procedures").

[10] See *Cripe v. City of San Jose* (9th Cir. 2001) 261 F.3d 877, 884 ("If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply"); 42 U.S.C. §§ 12111 ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential"), 12131-12132 (prohibiting discrimination against individuals who meet

(continued…)

the details of the Brown Act's provisions regarding in-person meeting attendance at public locations are relevant to a reasonable accommodation analysis under the ADA. For purposes of the question presented here, the relevant inquiry is whether the Brown Act considers in-person meeting attendance at public locations to be an "essential function" or "essential eligibility requirement."

In 2001, we considered the same substantive question.  We concluded that remote participation could *not* be a reasonable accommodation under the ADA.[11]  Among other considerations, we discerned from the Brown Act that in-person meeting attendance by a member of a Brown Act body at a public location was an "essential function" and "essential eligibility requirement."  At that time, the Brown Act did not allow a member to participate in a meeting remotely from a nonpublic location in any circumstance whatsoever.[12]  Although the Act did authorize members to participate in meetings by "teleconferencing" (by audio or visual means), that option was available only if the teleconferencing location itself was also open to the public.[13]

Since then, the Legislature has modified the Brown Act.  Intervening amendments allow remote participation in meetings by members from nonpublic locations in certain circumstances.[14]  As we will explain, those amendments reveal that remote participation no longer falls outside the realm of what can be a "reasonable accommodation" for purposes of the ADA.

---

public entity's "essential eligibility requirements"); see, e.g., *Peden v. City of Detroit* (2004) 470 Mich. 195, 209 (review of state law governing police officers to identify "essential functions" enabling such officers to perform duties).

[11] 84 Ops.Cal.Atty.Gen. 181, 185-188 (2001).

[12] See *ibid*.

[13] See Stats. 1998, ch. 260, § 1 (providing that "each teleconference location shall be accessible to the public," "at least a quorum of the members of the legislative body shall participate from locations within" the agency's jurisdiction, and that "agenda shall provide an opportunity for members of the public to address the legislative body directly . . . at each teleconference location" (Gov. Code, § 54953, subd. (b)(3)), and defining "teleconference" to mean a meeting of members "in different locations, connected by electronic means, through either audio or video, or both" (*id*., § 54953, subd. (b)(4)).)

[14] See, e.g., Stats. 2023, ch. 534, § 1 (Gov. Code, § 54953, subds. (e), (f), (j)(4)); Stats. 2022, ch. 285, § 1 (same); Stats. 2021, ch. 165, § 3 (Gov. Code, § 54953, subd. (e)).

23-1002

**ANALYSIS**

**Reasonable Accommodation for a "Qualified Individual" with a Disability Under the ADA**

Under the ADA, a person with a disability is someone who has "a physical or mental impairment that substantially limits one or more" of the person's "major life activities."[15]  Before a requirement for a reasonable accommodation applies, it must be established that the person is a "qualified individual" with a disability.  The meaning of a "qualified individual," and the factors informing whether an accommodation for such an individual is "reasonable," turn on which portion of the ADA applies.[16]

The ADA is divided into titles, and the first two are implicated here.[17]  Title I applies to employment by "covered entities" (including local governments), which are defined in part by whether the entity employs more than a threshold number of employees in a specified period.[18]  Title II applies to participation in state and local government services, programs, and activities.[19]

Whether serving as a member on a board of a local agency governed by the Brown Act constitutes employment under Title I, or instead participation in a program or activity under Title II, can depend on the particular board, commission, or body.[20]  Thousands of

---

[15] 42 U.S.C. § 12102(1)(A); see 29 C.F.R. § 1630.2(i) (defining major life activities to include various tasks, such as working and "operation of a major bodily function").

[16] See, e.g., 42 U.S.C. §§ 12111(8) (defining "qualified individual" under Title I), 12131(2) (defining "qualified individual with a disability" under Title II).

[17] See Pub.L. 101-336 (July 26, 1990), 104 Stat. 327 (enacting five titles).

[18] 42 U.S.C. § 12111(2) ("covered entity" includes "employer"); *id*., § (5)(A) (defining "'employer'" as one "engaged in an industry affecting commerce" with "15 or more employees" for "20 or more calendar weeks in the current or preceding calendar year," and includes "any agent of such" employer); see *Zimmerman v. Oregon Dept. of Justice* (9th Cir. 1999) 170 F.3d 1169, 1177 ("Congress consciously and expressly chose to include the employment practices of state and local governments in Title I").

[19] 42. U.S.C. §§ 12132, 12131(1)(A); see, e.g., *Willits v. City of Los Angeles* (C.D. Cal. 2013) 925 F.Supp.2d 1089, 1093 (stating that City of Los Angeles is covered by Title II).

[20] Compare *Zimmerman v. Oregon Dept. of Justice*, *supra*, 170 F.3d at pp. 1174, 1176, 1178-1179 (Title II applies to public agency "outputs," not "inputs" like employment which is covered by Title I) with *Where Do We Go Berkeley v. California Dept. of Transportation*, *supra*, 32 F.4th at p. 861 (Title II "bring[s] within its scope anything a public entity does," and "whether it is a normal function of a governmental entity," quoting *Barden v. City of Sacramento* (9th Cir. 2002) 292 F.3d 1073, 1076); see, e.g.,

(continued…)

23-1002

bodies governed by the Brown Act exist.[21]  Given the myriad ways in which these bodies may be formed and operate, it would appear infeasible and imprudent to make a universal pronouncement about whether board membership falls under Title I versus Title II.  But we need not embark on such an endeavor; in either case, our answer to the question presented here is the same.  To explain why, we must return to the concepts of a "qualified individual" and a "reasonable accommodation."  Those terms have multiple meanings under the ADA, but we focus only on those that are relevant to our purposes.[22]

Under Title I, a qualified individual with a disability is someone who "can perform the essential functions" of the job in question—that is, the "fundamental job duties of the employment position"—with or without reasonable accommodation.[23]  A job function may be essential, for example, "because the reason the position exists is to perform that function."[24]  Factors that help to identify essential functions may include (among others) the employer's judgment on what functions are essential, the employer's written job descriptions, how much time is spent performing the function, consequences of not requiring the function to be performed, work by past employees in the job, and work of current employees in similar jobs.[25]

---

*Mirka v. Langley, City of* (9th Cir. 2001) 16 Fed.Appx. 665, 666 (rejecting city hall volunteer's Title II claim because her services were "'input' rather than 'output' functions"); *Holmes v. City of Aurora* (N.D. Ill., Jan. 18, 1995, No. 93 C 0835) 1995 WL 21606, at *3-4 (stating that city's pension board of mayoral appointees, current city employees, and former city employee would be covered by Title I if board "is considered to be plaintiff's employer or an agent of the City," but "should be considered a 'public entity'" covered by Title II because of nature and extent of its relationship with city); see also fns. 60-73, *post*, and corresponding text in the body discussing members' reasonable accommodation claims all brought under Title II.

[21] See, e.g., Letter from David Chiu, City Attorney for the City and County of San Francisco to Deputy Attorney General Catherine Bidart, February 9, 2024, p. 2 (stating that San Francisco has "well over 100 Brown Act bodies"); see also Gov. Code, § 54952 (broadly defining "legislative body").

[22] See, e.g., 42 U.S.C. §§ 12102(1)(C) (defining "disability" to include individual "regarded" as having qualifying impairment), 12201(h) (no reasonable accommodation is required for such individual).

[23] 42 U.S.C. § 12111(8) (defining "qualified individual" with disability); 29 C.F.R. § 1630.2(n)(1) (defining "essential functions" to include "fundamental job duties of the employment position" and to exclude "marginal functions").

[24] 29 C.F.R. § 1630.2(n)(2) (listing examples of reasons why function could be essential).

[25] 29 C.F.R. § 1630.2(n)(3).

23-1002

A covered employer is responsible for providing a reasonable accommodation to a qualified individual with a disability unless it would cause the employer "undue hardship."[26] But no failure to accommodate occurs if an otherwise qualified individual cannot, even *with* a reasonable accommodation, meet the employer's "qualification standards" that are both "job-related and consistent with business necessity."[27] The distinction between "qualification standards" and "essential functions" is that the latter are basic duties while the former are "personal and professional attributes," which may include "skill, experience, education, physical, medical, safety and other requirements."[28]

Under Title II, a qualified individual with a disability is an individual who "meets the essential eligibility requirements" to "participat[e] in programs or activities provided by a public entity," with or without reasonable modification.[29] An accommodation to a qualified individual is not reasonable under Title II if it would fundamentally alter the government program or activity or cause an undue financial or administrative burden.[30] An accommodation would fundamentally alter a program if it would compromise the "essential nature" of the program.[31]

For its part, the United States Department of Justice has issued informal guidance that expresses its view on the availability of remote participation by members at city council meetings as a reasonable accommodation under the ADA in appropriate circumstances.[32] The guidance states that:

---

[26] 42 U.S.C. § 12112(b)(5)(A); see 42 U.S.C. § 12111(10) (defining "undue hardship" as "action requiring significant difficulty or expense" in light of certain factors including cost of the accommodation and entity's resources).

[27] 42 U.S.C. § 12113(a).

[28] *Bates v. United Parcel Service, Inc.* (9th Cir. 2007) 511 F.3d 974, 989-990; 29 C.F.R. § 1630.2(n)(1) (essential functions) & *id*. (q) (qualification standards).

[29] 42 U.S.C. § 12131(2).

[30] *Tennessee v. Lane* (2004) 541 U.S. 509, 532; 28 C.F.R. §§ 35.130(b)(7)(i), 35.150(a)(3).

[31] *Alexander v. Choate* (1985) 469 U.S. 287, 300. For example, "moving a beach volleyball program into a gymnasium, so a player who uses a wheelchair can participate on a flat surface without sand, would 'fundamentally alter' the nature of the game." (U.S. Dept. of Justice Civil Rights Division, "ADA Update: A Primer for State and Local Governments," originally issued Jun. 1, 2015, and last updated Feb. 28, 2020, available at https://www.ada.gov/resources/title-ii-primer/ (as of July 24, 2024), (hereafter, "US DOJ ADA Primer").)

[32] See 42 U.S.C. § 12206; see also *id*., §§ 12134 ("Attorney General shall promulgate

(continued…)

7

23-1002

[I]f an elected city council member has a disability that prevents her from attending council meetings in person, delivering papers to her home and allowing her to participate by telephone or videoconferencing would enable her to carry out her duties.[33]

Our independent analysis below reaches a similar conclusion with respect to local officials subject to the Brown Act. We first explain our conclusion from 2001.

## 2001 Opinion

Our 2001 opinion concluded that remote participation in a meeting subject to the Brown Act could not be a reasonable accommodation under either Title I or Title II.[34] As to Title I, the opinion determined that the Brown Act's requirement for in-person attendance at meetings at locations open to the public was an essential function of holding office on a local agency board.[35] It observed that "[p]ublic attendance facilitates the people's right to participate in all phases of local government decision-making and serves to prevent misuse of the democratic process by secret legislative action at the local government level."[36] The opinion also determined that, under the Brown Act, "the ability to attend scheduled meetings that are accessible to the public is both 'job-related and consistent with business necessity,'" and "related to the requisite qualifications" to hold office at the local level.[37] It explained:

[N]othing other than the presence of such person [that is, a member] at a publicly accessible site would serve the state's legitimate interest in public attendance and participation in the decision-making process. While teleconferencing may consist of electronic connection through either audio, video, or both (Gov. Code, § 54953, subd. (b)(4)), no camera focused upon a member in a remote location closed to the public may detect the presence of other influences, including persons, within that location, and thus cannot

---

regulations in an accessible format that implement this part [Title II]"); *Fortyune v. City of Lomita* (9th Cir. 2014) 766 F.3d 1098, 1104 (giving manual comprising "DOJ's interpretation of its ADA implementing regulations" controlling weight unless plainly erroneous or inconsistent).

[33] US DOJ ADA Primer, *ante* fn. 31.

[34] 84 Ops.Cal.Atty.Gen., *supra*, pp. 185-188.

[35] *Id.*, p. 185.

[36] *Ibid*.

[37] 84 Ops.Cal.Atty.Gen., *supra*, pp. 185-186.

with similar effectiveness serve the public's interest in "curb[ing] misuse of the democratic process."[38]

The opinion further determined that even if Title II instead applied, remote participation could not be a reasonable accommodation, for the same reasons set forth in the Title I analysis. It concluded that "the ability to attend a meeting of the board at a location accessible to members of the public, including individuals with disabilities, would constitute an essential eligibility requirement."[39] As discussed earlier, Title II does not require that a reasonable accommodation be made for an individual who does not meet an "essential eligibility requirement."[40] The 2001 opinion resolved the Title II analysis based on that factor alone.[41]

**Subsequent Amendments to the Brown Act Illustrate That Remote Participation Can Be a Reasonable Accommodation**

Subsequent changes to the Brown Act lead us to a different conclusion from the one described in the 2001 opinion. As the 2001 opinion observed, the Brown Act at that time authorized members to participate in meetings by audio or video "teleconferencing" only if, among other requirements, the teleconferencing location was open to the public.[42] But the Legislature has since amended the Brown Act multiple times to authorize remote participation by members from nonpublic locations in certain circumstances, using two-way, real-time video and audio streaming—technology which was not nearly as developed and widely used in 2001 as it is today.[43] The across-the-board prohibition on remote participation by members in nonpublic locations has been removed from the Act.

In 2021, during the COVID-19 pandemic, the Legislature amended the Brown Act to allow remote participation from nonpublic locations by *all* members (regardless of any disability), using two-way, real-time video and audio streaming.[44] The authorization

---

[38] *Id*., p. 186, quoting *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 555.

[39] *Id*., p. 188.

[40] See *ante* fn. 29 and corresponding text in the body.

[41] 84 Ops.Cal.Atty.Gen., *supra*, p. 188. As discussed above, if the essential eligibility requirements are met, a particular accommodation would still not be owed if the accommodation would fundamentally alter the nature of the government activity at issue or would be an undue burden. (See *ante* fns. 30-31 and corresponding text in the body.)

[42] Gov. Code, § 54953, subd. (b), as amended by Stats. 1998, ch. 260, § 1; see *ante* fn. 13.

[43] Stats. 2021, ch. 165, § 3, eff. Sept. 16, 2021; Stats. 2022, ch. 285, § 1, eff. Jan. 1, 2023; Stats. 2023, ch. 534, § 1, eff. Jan. 1, 2024.

[44] Stats. 2021, ch. 165, § 3, eff. Sept. 16, 2021 (adding Gov. Code, § 54953, subd. (e) to

(continued…)

9

was predicated on a declared state of emergency and the presence of health- or safety-related circumstances.[45]  In 2022, as those circumstances began to wane, California started planning for COVID-19 to become an endemic disease.  The Governor announced that the declared state of emergency—one of the prerequisites for members to meet remotely under the 2021 amendment—would end in February 2023, setting the stage for in-person meetings to resume.[46]

Against this backdrop, the Legislature amended the Act in 2022 to temporarily authorize (until 2024) an *individual* member to occasionally participate from a nonpublic location in certain exceptional circumstances.  That authorization was subject to various requirements, including two-way streaming and a requirement that a quorum of members participate from a single physical location open to the public.[47]  In 2023, the Legislature extended that limited authorization until 2026.[48]  Subject to various requirements, the

___

allow remote meetings with conditions, such as allowing public to directly address members, and prohibiting action on agenda when disruption prevents broadcast or comment).  This exception was originally set to expire in 2024 (*id*., adding Gov. Code, § 54953, subd. (f); later the exception was amended, including an amendment for the exception to last indefinitely (Stats. 2023, ch. 534, § 2, eff. Jan. 1, 2024, operative Jan. 1, 2026).

[45] Stats. 2021, ch. 165, § 3, eff. Sept. 16, 2021 (amending Gov. Code, § 54953, subd. (e) to allow remote meetings during declared state of emergency when social distancing is officially imposed or recommended, or if meeting's purpose is to determine whether in-person meeting would imminently risk attendee health or safety, with periodic related findings).

[46] See Press Release, "Governor Newsom to End the COVID-19 State of Emergency," Oct. 17, 2022 (announcing declared state of emergency from COVID-19 to end February 28, 2023), available at https://www.gov.ca.gov/2022/10/17/governor-newsom-to-end-the-covid-19-state-of-emergency/, as of July 24, 2024; Press Release, "Governor Newsom Marks End of California's COVID-19 State of Emergency," Feb. 28, 2023, available at https://www.gov.ca.gov/2023/02/28/governor-newsom-marks-end-of-californias-covid-19-state-of-emergency/, as of July 24, 2024; see also Associated Press, "California Changes Its COVID Strategy and Announces a Plan to Live with the Virus," updated Feb. 18, 2022, available at https://www.npr.org/2022/02/18/1081655623/california-adopts-nations-first-endemic-virus-policy, as of July 24, 2024 (covering announced preparations for endemic stage).

[47] Stats. 2022, ch. 285, § 1, eff. Jan. 1, 2023 (adding Gov. Code, § 54953, subds. (f), (j), (k)).

[48] Stats. 2023, ch. 534, § 1, eff. Jan. 1, 2024 (amending Gov. Code, § 54953, subd. (k)).  A bill is pending to amend this legislation; as of the date of this opinion, the bill would

(continued…)

new authorization allows a member to participate in a meeting remotely for a limited number of times, if there is either "just cause" or "emergency circumstances."[49]

The first of those exceptions—the one for "just cause"—explicitly refers to ADA accommodations. Specifically, "just cause" can be established based on a need related to a disability that has not been "otherwise accommodated" under the ADA.[50] In other words, the exception authorizes a member to participate at meetings remotely because of a need related to a disability, but excludes from its ambit a disability *already* accommodated under the ADA. The most logical explanation for that exclusion is that the Legislature presupposed that a member may already participate remotely for an unlimited number of sessions as an ADA accommodation.[51]

Returning to our chronology, in 2023 the Legislature extended indefinitely the authorization for *all* members to meet remotely from nonpublic locations during a declared state of emergency as specified.[52] We refer to these as "pandemic-like"

---

provide a more detailed specification for calculating the number of times a member may participate remotely. (Assem. Bill No. 2302 (2023-2024 Reg. Sess.), § 1, as introduced Feb. 12, 2024.)

[49] Gov. Code, § 54953, subd. (f)(2).

[50] "[J]ust cause" includes "[a] need related to a physical or mental disability . . . not otherwise accommodated by subdivision (g)," and subdivision (g) refers to the ADA. (Gov. Code, § 54953, subd. (j)(2)(C); see *id*., subd. (g) (reciting requirement for legislative body to have procedure for swiftly resolving requests for ADA reasonable accommodations).) A disability that has not been "otherwise accommodated" could be, for example, in the midst of an interactive process to identify a reasonable accommodation. (See *Anthony v. Trax Internat. Corp.* (9th Cir. 2020) 955 F.3d 1123, 1134 (recounting employer obligation to engage in interactive process with employees to find reasonable accommodation).)

[51] The exception allowing remote participation for "just cause" may also be met by caregiving needs, a contagious illness, or official travel. (Gov. Code, § 54953, subd. (j)(2)(A), (B) & (D).) The other exception for an individual member to participate remotely—in "emergency circumstances"—defines such circumstances as "a physical or family medical emergency that prevents a member from attending in person." (Gov. Code, § 54953, subd. (j)(1).)

[52] Stats. 2023, ch. 534, § 2, eff. Jan. 1, 2024 (amending Government Code section 54953 subdivisions (e) and (j), operative January 1, 2026, to amend and preserve authorization with no sunset date for entire body to meet remotely during declared state of emergency, if legislative body makes related findings, as specified).

11

circumstances.[53]  In such circumstances, if a majority of members makes certain health- or safety-related findings during a declared state of emergency, all members may participate remotely for an unlimited number of meetings at nonpublic locations.[54]  So even after the limited authorization for individual members to participate remotely for "just cause" or in "emergency circumstances" expires in 2026, the Act will continue to allow remote participation by all members in "pandemic-like" circumstances.

These recent changes to the Brown Act point to a conclusion that is different from the one we reached in 2001.  Perhaps most telling is the new "just cause" exception, allowing remote participation for a need related to a disability—but not a disability that has been "otherwise accommodated" under the ADA.[55]  While this exclusion is currently set to expire in 2026, it nevertheless reveals a legislative belief upon its enactment that remote participation was already available for a qualifying individual as an accommodation under the ADA.[56]  We therefore conclude that, in light of the recent legislative amendments, in-person attendance is no longer an "essential job function" nor "an essential eligibility requirement" under Title I or Title II, as the Legislature has determined that remote participation is compatible with membership on a Brown Act body.

**Conditions on Remote Participation**

Although the Brown Act now allows remote participation in certain circumstances, in-person attendance at physical locations open to the public remains the default under the Act.  The Act therefore places multiple conditions on remote participation.  One requires virtual access by the member so the public can address members directly by video and audio streaming (which again, was not nearly as developed and used in 2001 as it is today); if such access is disrupted, the body (through its members) cannot take action on any agenda item until the streaming connection is

---

[53] We do not foreclose the possibility that a declared state of emergency unrelated to a pandemic could entail circumstances and related findings that would satisfy the exception allowing all members to participate remotely.  (See *ibid*.)

[54] Gov. Code, § 54953, subd. (e); Stats. 2023, ch. 534, § 2 (amending Gov. Code, § 54953, subd. (e), operative Jan. 1, 2026).

[55] See *ante* fn. 50.

[56] Remote participation on an individual case-by-case basis as a reasonable accommodation under the ADA is also consistent as a policy matter with the Brown Act provision allowing all members to participate remotely in pandemic-like circumstances.  In such circumstances, the Act makes remote participation available for the safety of everyone.  Safety concerns also support allowing an individual member to participate remotely if their particular disability puts them at heightened risk of serious illness or death due to COVID-19 (or other maladies or conditions).

12

restored.[57]  Another condition requires the member who is participating remotely in a non-public location to disclose the identity of any adults who are present in the room with the member and the nature of their relationship.[58]

We do not purport to prescribe here all of the conditions that could or should be placed on remote meeting attendance as part of a reasonable accommodation.  Nor do we attempt to prescribe all of the ways in which technology can be employed to simulate in-person meetings to best promote the Act's purpose of public participation—which will likely evolve over time.  But mindful of the Act's strong preference for in-person meetings, we conclude that remote participation as a reasonable accommodation must be done in a manner that simulates in-person attendance, as the Act requires where it allows remote participation for other reasons.  This would include the Act's requirements that remote participants (1) use two-way, real-time video and audio streaming and (2) disclose the presence of other adults at the remote location.[59]

**Authority from Other Jurisdictions Supports Our Conclusion**

Our answer to the question presented generally accords with cases in other jurisdictions that have considered whether remote participation could be a reasonable accommodation despite state open-meeting laws that generally require in-person attendance.  We are aware of three such cases, all decided by district courts.  In the first two cases, the courts upheld remote participation as a reasonable accommodation.  In the third case, the court found a lack of factual support for remote participation as a reasonable accommodation—but did not rule out the possibility of remote participation in other, more appropriate factual circumstances.

In *Silver v. City of Alexandria*, a federal district court in Louisiana granted a 98-year old city council member a preliminary injunction allowing him to participate remotely in city council meetings as a reasonable accommodation under Title II of the ADA because his cardiovascular-related disability and age made him "particularly

---

[57] See Gov. Code, §§ 54953, subds. (e)(2)(A) (public access), (e)(2)(B) (disruption), (f)(1)(D) (same), subds. (f)(1)(A) (video and audio) & (f)(2)(C) (same).

[58] Gov. Code, § 54953, subd. (f)(2)(B); cf. 84 Ops.Cal.Atty.Gen., *supra*, p. 186.

[59] Many commenters pointed to advances in technology—and our collective experience with that technology during the pandemic—as a basis for concluding that remote participation is a reasonable accommodation.  While we acknowledge that technology has advanced in this area, we stress that our analysis is not driven by those advances.  Our analysis instead turns on legal changes to the Brown Act, which reveal that a member may, in appropriate circumstances, attend a meeting remotely from a nonpublic location as a reasonable accommodation under the ADA.

23-1002

susceptible" to succumbing to COVID-19.[60] The court observed that the state's open meetings law for many years contained no exception allowing remote participation, but that a recent amendment allowed such participation (on voting and debating) during public health emergencies such as the pandemic.[61] The court also noted the prevalence of video-streaming technology, which was used for the hearing on the injunction.[62] While "[i]t is true that virtual participation by an individual council member is not exactly the same as participation by physical presence," the court ultimately determined there would be "no substantial negative impact on the operation of city government by the granting of injunctive relief," and that the accommodation "would not alter the nature" of the meetings.[63]

Next, in *Palmer v. Michigan*, a federal district court in Michigan granted a preliminary injunction allowing a board member of a multi-county mental health agency to participate in meetings remotely as a Title II ADA reasonable accommodation.[64] An exception to the Michigan open meetings law had allowed remote participation for medical conditions. But it expired at the end of 2021, after which the health agency denied plaintiff's request to continue to participate remotely.[65] While the agency mandated social-distancing and mask-wearing protective measures, plaintiff's cerebral palsy made him at high risk of illness if exposed to COVID-19, and his disability interfered with his ability to communicate while wearing a mask.[66] The court observed that the open meetings law continued to authorize remote participation for a member who was absent for military duty.[67] The court therefore rejected the agency's claim that any decision taken while plaintiff participated remotely could be rendered void for non-compliance with the law because "military members can already participate remotely."[68] The court concluded that the plaintiff's remote participation would cause little or no

---

[60] *Silver v. City of Alexandria* (W.D. La. 2020) 470 F.Supp.3d 616, 618, 620, 625.

[61] *Id*., at pp. 623-624.

[62] *Id*., at p. 623.

[63] *Id*., at pp. 623-624.

[64] *Palmer v. Michigan* (W.D. Mich., Mar. 29, 2022, No. 1:22-CV-90) 2022 WL 908966, at **1, 7 (hereafter, *Palmer*). This case mentions and reaches the same conclusion of opinions by the Attorney General of Michigan. (See *id*. at **2, 4, citing Atty. Gen. Op. 7, Atty. Gen. Op. 15-16, ECF No. 11-1.)

[65] *Palmer*, *supra*, at **1-2.

[66] *Ibid*.

[67] *Palmer*, *supra*, at *6.

[68] *Ibid*.

harm, and that it "would not impose an undue burden" on the health agency nor "fundamentally alter its programs or services."[69]

The last case is *Chew v. Legislature of Idaho*.[70] Although the Idaho district court in that case denied a request for a temporary restraining order sought by members with disabilities seeking a Title II accommodation to participate remotely in sessions of the Idaho Legislature, that denial casts no doubt on our conclusion.[71] The case instead illustrates that not every disability is one that necessitates remote participation. In rejecting the request, the court drew upon Ninth Circuit cases prescribing an individualized, case-by-case inquiry to determine the reasonableness of a requested accommodation.[72] The court found nothing to rule out other types of accommodations such as masks, plexiglass barriers, and choice of seat.[73]

For the reasons discussed above, we conclude that the ADA requires a local agency's legislative body to allow remote participation from a nonpublic location as a reasonable accommodation for a qualifying individual whose disability precludes their in-person attendance, subject to the requirements of the ADA.[74] Under the Brown Act, the

---

[69] *Ibid*.

[70] *Chew v. Legislature of Idaho* (D. Idaho 2021) 512 F.Supp.3d 1124 (hereafter, *Chew*).

[71] See *id*., at pp. 1126-1128; see also *id*., at p. 1127 (explaining that temporary restraining order, like preliminary injunction, is to preserve status quo, but typically lasts 28 days while preliminary injunction may extend until lawsuit ends).

[72] *Id*., at p. 1129, citing *Wong v. Regents of Univ. of Cal.* (9th Cir. 1999) 192 F.3d 807, 818; *Crowder v. Kitagawa*, *supra*, 81 F.3d at p. 1486.

[73] *Chew*, *supra*, at pp. 1130-1131.

[74] We acknowledge that the ADA excuses a covered entity from providing an otherwise required accommodation to an employee where it "can demonstrate that the accommodation would impose an undue hardship" on its operations, defined as "an action requiring significant difficulty or expense" when considered in light of certain factors including cost of the accommodation and the entity's resources. (See 42 U.S.C. §§ 12112(b)(5)(A) & 12111 (defining "undue hardship"); see also 28 C.F.R. § 35.164 (public entity not required to make modification for accessible communication "that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens"). While the accommodation at issue here—remote attendance by a member of a local agency legislative body—does not appear to be the type of accommodation that would typically present such financial or technical burdens, we cannot conclude that this would never be the case. We do not address these hypothetical concerns here. Such concerns, if they were to arise, would be determined based on the particular facts and circumstances, under controlling provisions and interpretations of the ADA.

23-1002

remote participation must be conducted in a manner that simulates in-person attendance at meetings held in-person and open to the public.  To accomplish this, the Act provides conditions on how an individual member may participate remotely—namely, by the member using two-way live video and audio streaming and disclosing the identity of any adults who are present in the room with them at the remote location.

23-1002